# EXHIBIT A


| 2120 - Served | 2121 - Served | |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **SUMMONS** | **ALIAS - SUMMONS** | (2/28/11) CCG N001 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____CHANCERY_____ DIVISION

No. _____

Santander Consumer USA Inc.

1601 Elm Street, Suite 800

Dallas, Texas 75201

CHERYL JOHNSON-MORRIS, individually and on behalf of all others similarly situated,
_____
**(Name all parties)**

v.

SANTANDER CONSUMER USA INC., an Illinois corporation,
_____

## ⊙ SUMMONS ○ ALIAS SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

⊙ Richard J. Daley Center, 50 W. Washington, Room ___802___, Chicago, Illinois 60602

○ **District 2 - Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

○ **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

○ **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

○ **District 5 - Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

○ **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60428

○ **Child Support**
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 44146

Name: Edelson PC

Atty. for: Plaintiff, Cheryl Johnson-Morris

Address: 350 North LaSalle Street, Suite 1300

City/State/Zip: Chicago, Illinois 60654

Telephone: (312) 589-6370

Service by Facsimile Transmission will be accepted at: _____

WITNESS, _____, _____

_____
**Clerk of Court**

Date of service: _____, _____
(To be inserted by officer on copy left with defendant or other person)

_____
**(Area Code)   (Facsimile Telephone Number)**

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| CHERYL JOHNSON-MORRIS, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff,* | |
| v. | |
| SANTANDER CONSUMER USA INC., an Illinois corporation, | |
| *Defendant.* | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Cheryl Johnson-Morris ("Plaintiff") brings this Class Action Complaint and

Demand for Jury Trial against Defendant Santander Consumer USA Inc. ("Santander") to stop

its practice of charging unlawful debt collection fees and to obtain redress for all persons injured

by its conduct, as well as individually to seek redress for Santander's unlawful and harassing

telephone calling practices. Plaintiff, for her Complaint, alleges as follows upon personal

knowledge as to herself and her own acts and experiences, and, as to all other matters, upon

information and belief, including investigation conducted by her attorneys.

### NATURE OF THE ACTION

1.      Defendant Santander is an industry leader in "nonprime" auto loans.[1]

Approximately 79% of its auto loan portfolio consists of "nonprime receivables" from

consumers "who do not qualify for conventional consumer finance products as a result of, among

---

[1] Santander Consumer USA Holdings Inc., *Annual Report (Form 10-K)*, at 6 (March 2, 2015), *available at* https://www.sec.gov/Archives/edgar/data/1580608/000158060815000031/ santander201410-k.htm (last accessed November 16, 2015).

other things, a lack of or adverse credit history, low income levels and/or the inability to provide adequate down payments." *Id.* at 18.

2.      Not surprisingly, Santander's business model of targeting high-risk, nonprime loans causes its overall loan delinquency rate to be substantially higher than industry averages, and a large percentage of Santander consumers have difficulty making their loan payments precisely when due. Indeed, due in part to its focus on nonprime loans, it "repossessed 227,041 vehicles, incurring $1.7 billion in net losses, during the twelve months ended December 31, 2014." *Id.* Santander's target consumers are often in unstable circumstances where they are relatively more susceptible to harassment, oppression, and abuse.

3.      Unfortunately, Santander capitalizes on these circumstances by incessantly calling consumers and steering them into using unnecessary, high-fee services to make routine loan payments on fear of otherwise potentially losing what is often their primary means of transportation. For instance, Santander often pushes consumers to pay through a Western Union service—which imposes large processing fees that are surreptitiously shared with Santander—even though other free methods of timely payment are in fact available. These fees are not pass-through costs reflective of actual third-party processing charges but rather are arbitrary amounts imposed at Santander's direction to drive excess profits for itself.

4.      Santander also uses advanced autodialing equipment and prerecorded messages to repeatedly machine-dial cellular telephone numbers, like Plaintiff's, without prior express consent.

5.      Through this standardized course of conduct, Santander routinely and willfully violates the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 (the "FDCPA"), which prohibits debt collectors like Santander from collecting "*any* amount" incidental to a consumer

2

debt unless "such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1) (emphasis added). Santander also violates the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"), which strictly forbids the repetitive autodialing and robocalling of private cellular telephone numbers, without consent.

6. In response to Defendant's unlawful conduct, Plaintiff files the instant lawsuit seeking an injunction requiring Defendant to cease imposing unlawful fees on consumers, as well as an award of actual and statutory damages to the members of the Classes as provided under the FDCPA, together with costs and reasonable attorneys' fees. She further seeks to recover statutory damages under the TCPA on an individual basis only, trebled due to the knowledge and willfulness of Defendant's conduct, together with costs and reasonable attorneys' fees.

## PARTIES

7. Plaintiff Cheryl Johnson-Morris is a natural person and citizen of the State of Illinois and resident of Cook County.

8. Defendant Santander is a limited liability company organized and existing under the laws of the State of Illinois with its principal place of business located at 1601 Elm Street, Suite 800, Dallas, Texas 75201.

9. Defendant Santander is registered to do business with the Illinois Secretary of State and does business in Illinois and throughout the United States.

## JURISDICTION AND VENUE

10. The Court has personal jurisdiction over this action pursuant to 735 ILCS 5/2-209(a)-(b) because Defendant is incorporated pursuant to the laws of this State, maintains real

estate within this State, transacts business within this State, and because the tortious conduct alleged in this Complaint occurred in, was directed to, and/or emanated from this State.

11.    Venue is proper because Defendant maintains real estate in Cook County and regularly conducts business transactions in Cook County, and because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from Cook County. Additionally, Plaintiff, an individual, is a resident of Cook County.

## COMMON FACTUAL ALLEGATIONS

12.    Santander services over $24 billion in consumer loans, more than 75% of which are nonprime.[2] Among other things, it creates and sends monthly statements to consumers, collects loan payments, and processes loan payments. In addition to servicing its own loans, it regularly services loans originated by other companies. As such, it regularly collects or attempts to collect debts owed to others and is a "debt collector" as that term is defined in the FDCPA. Many of the debts Santander services were in default at the time Santander acquired them.

13.    Many of Santander's "customers" are involuntary consumers who are only forced to work with Santander because it acquired the rights to collect on their loans without their prior knowledge or consent or because their car dealerships independently elected to use Santander to provide subprime financing. These consumers, whose voluntary relationships with car dealerships have locked them into financing relationships with Santander, often find that in order to keep their vehicles they must deal with Santander for as long as it services their loans, regardless of how they are treated by it or its employees.

14.    Due to these captive economics, Santander has little incentive to treat borrowers well. Indeed, Santander often subjects consumers, who may already feel overwhelmed by their

---

[2] *Id.* at 50.

4

struggles to make timely payments and who may believe their means of transportation are at risk, to the private importuning of trained and aggressively-incentivized collection agents applying high-pressure collection techniques in direct, intense, real-time encounters. When these collection agents order consumers to pay immediately or face adverse consequences (such as potentially losing their vehicles), such consumers may find it difficult fully to evaluate all available alternatives with reasoned judgment and may readily succumb to the agent's insistence upon immediate payment, despite the imposition of excessive processing fees.

15.     Accordingly, Santander has routinely represented that payment methods with convenience fees, processing fees, or other such fees were the only payment methods available for consumers to use to make timely payments on their personal debts, even when other no-cost or lower-cost payment methods were actually available. These fees exceed any charges actually imposed by third-party payment processors, if any, for the cost of processing payments, and as such are not pass-through costs but rather serve as arbitrary profit drivers. By imposing these arbitrary fees, Santander has effectively and artificially enlarged the debts owed by thousands of consumers, enriching itself at the expense of those least able to afford it.

16.     Consumers complain about Santander's fee-steering, but due to its other practices—such as imposing stiff late fees while taking up to two full business weeks to post payments—consumers feel compelled to pay Santander's arbitrary fees anyways. Not surprisingly, consumer complaints against fee-steering, and against Santander generally, are legion:[3]

---

[3] Screenshots from Consumer Affairs, available at http://www.consumeraffairs.com/finance/ santander.html; and Ripoff Report, available at http://santander-consumer.pissedconsumer. com/santander-consumer-usa-is-a-ripoff-20100920199159.html (last accessed November 16, 2015).



**Figure 1** (Santander consumer ratings.)

I received notice one week ago that Santander is now handling my auto payments that were with Citifinancial. After visiting their site and trying to log on with my username and password from Citifinancial's site as they said it would work I had to call their customer service twice, because the first time I was hung up on after an associate put me on hold for 5 minutes. The second time they said I had to go back to their website, follow a bunch of steps, then submit my request to have my password reset.

After I received the email to reset my password, I then logged on hoping to pay for my account online via their site and not have to pay $10.95 as they charge to do so over the phone as I used to do with Citifinancial for free. NO LUCK! They charge $10.95 whether you pay online with checking account/ATM/credit or over the phone. You can mail your payment but it takes 7-10 days to post which means you'll be charged interest and late fees. They know it's a setup, which is why they try and sell you on the fact that paying the $10.95 will 'save you' from paying more in fees late if your payment isn't credited on time.

I'd have no problem mailing my payment 14 days in advance if I hadn't read online from various sources that people who send in payments via check have the amounts altered and initialed by an employee or someone rips off their account info and suddenly random charges start appearing on their accounts.

I'm SO MAD I have to pay $10.95 tonight to 'ensure' my payment won't be late to avoid fees, even though it's 10:15pm on 09/19 and my payment isn't due until 9/27. Well, I know in 2 weeks I will be getting a money order and mailing it because I will not pay $10.95 to PAY a bill nor risk giving these jokers my account # cause they hire unscrupulous employees.

**Figure 2** (Consumer complaining of Santander's fee-steering "setup.")

 Alan of Scottsdale , AZ on April 13, 2014

Satisfaction Rating
★

Been with this company 3 yrs. Never late on payment until one time, I made arrangements to pay more than half on due date then remaining balance 3 days later. Well, that was the worst mistake I made. They use the phone and internet as means to deceive you to add extra charges. Auto pay = made me believe by telling me over phone auto pay was activated. Checked online, it said on their website auto pay active only to learn 3 days after payment due, it was not taken from my bank account. I called and had to pay $11.00 convenience fee. This went on for 3 months. I finally decided to refinance my truck and relieve myself from this unbelievable situation I was in. They are nothing but crooks and anyone saying this company is a good one is full of it and most likely work for those lowlife greedy idiots. And I did contact BBB of Dallas to at least stand up to these morons.

Helpful? Yes No

**Figure 3** (Consumer complaining of Santander's ineffective auto-pay settings and fees.)

17.    Consumers are not alone in their complaints. At least one Santander employee has complained about preying on lower-income people in order to hold them hostage and charge extra fees:

✩ ✩ ✩ ✩ ✩ ▼    **it felt like you were chain tocomputer the did nothing good for employees**

Midrange (Current Employee), Fort Mill, SC – June 13, 2012

Pros: i just didn't see any pros        Cons: more cons then i could list

make as many calls as you can not caring how it impacted the customer or the employees. I learned that they pray on lower income people so the can charge a buch of extra fees and hold the customer hostage. We had a lot of people wanting to dio the right thing but, management would stop them but giving them bonus goals that would not allow them to do right. the hardest part of my job was knowing that we could help them, but only if it made santander more money. the most enjoyable is once in a while I could make difference in a customer life.

Was this review helpful? | Yes (2) | No

**Figure 4** (Employee complaining about holding lower-income consumers hostage to charge extra fees.)[4]

18.    Indeed, on a daily basis and for years, Santander has knowingly embarked on a systematic campaign of imposing unlawful and excessive convenience fees during routine

---

[4] Indeed.com, available at http://www.indeed.com/cmp/Santander-Consumer-USA-Inc/reviews (last accessed November 16, 2015.)

consumer payment transactions, all to artificially and unilaterally enlarge the consumer debts

owed to it. These convenience fees far exceed any actual third-party processing costs that

Santander actually incurs, are not expressly authorized by the original agreements creating the

consumer debts, and are not specifically permitted by Illinois law.

## FACTS RELATING TO PLAINTIFF JOHNSON-MORRIS

19.     On January 10, 2005, Plaintiff Johnson-Morris purchased a 2003 Ford Escape at

Jacobs Twin Honda in Chicago, Illinois. She purchased this vehicle primarily for personal and

household use and she financed her purchase through a consumer loan (*see* Retail Installment

Contract, attached hereto as Exhibit 1). This loan did not authorize convenience fees. *See id.*

20.     Plaintiff's loan was originated by HSBC Finance Corporation f/k/a Household

Automotive Finance Corporation ("HSBC"). *See id.* Accordingly, when Plaintiff became a

consumer obligated to pay a consumer debt that arose out of a transaction to purchase a personal

vehicle, Santander was not the original creditor.

21.     However, on or about November 10, 2009, Santander reached an agreement with

HSBC's auto finance entities to enter into a loan servicing agreement for its entire U.S. auto loan

portfolio, which was in liquidation.[5] At the time this agreement was announced, the "transaction

[was] expected to close in the first quarter of 2010." *Id.*

22.     On or about March 15, 2010, the aforementioned loan servicing agreement

between Santander and HSBC closed and took effect, and Santander acquired the servicing rights

to collect on Plaintiff's auto loan.

---

[5] *See* HSBC Finance, Press Release: *HSBC Finance, Santander Consumer in Agreement on HSBC's US Auto Business,* available at http://www.us.hsbc.com/1/2/home/about/press-room/2009/news_11102009_hsbc_auto_santander_announcement (last accessed November 19, 2015).

8

23.    At the time when Santander acquired the servicing rights to collect on Plaintiff's auto loan, she was unemployed, and she owed late fees in arrears and was otherwise in default. Santander placed a telephone call to her, informed her that it was calling to collect a debt, and represented that she was behind on her payments. Accordingly, Santander acquired the rights to service Plaintiff's debt at a time when she was actually or allegedly in default, and Santander is a debt collector with regards to Plaintiff and her debt.

24.    From the start, Santander placed incessant calls to Plaintiff in efforts to collect on her debt, including prerecorded voice calls to her cellphone. Defendant also placed calls to Plaintiff's cellphone using equipment having the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, *en masse*, by the thousands and without active human intervention (an "automatic telephone dialing system" or "ATDS").

25.    Plaintiff did not provide Defendant with her phone number, but instead had her number "trapped" when she called Defendant to make a payment. Accordingly, she never consented to receive Defendant's calls on her cellphone. To the contrary, she informed Defendant that they were calling her on a cellphone and specifically instructed Defendant to stop. Defendant continued calling anyway.

26.    Plaintiff estimates that between March 2010 and March 2011, Defendant called her cellphone with prerecorded messages between 20-30 different times and further called her cellphone with an ATDS many dozens of times.[6]

---

[6] An existing class action lawsuit involving TCPA and FDCPA claims against Santander, *Espejo v. Santander Consumer USA, Inc.*, No. 1:11-cv-8987 (N.D. Ill. December 19, 2011), has been pending since 2011 and serves to toll Plaintiff's claims.

9

27. Plaintiff made debt payments to Santander online and over the phone. When she did so, Santander processed her payments through a service it used in partnership with Western Union. Plaintiff was charged a fee for this service, even though no such fee was authorized by any agreement between Plaintiff and Santander or any specific provision of existing law.

28. Specifically, Santander charged and collected the following convenience fees from Plaintiff:

| Date | Method | Convenience Fee Amount |
|------|--------|------------------------|
| 03/19/10 | Phone | $15.00 |
| 04/16/10 | Internet | $5.00 |
| 05/14/10 | Internet | $5.00 |
| 06/11/10 | Internet | $5.00 |
| 07/20/10 | Internet | $5.00 |
| 08/22/10 | Internet | $5.00 |
| 09/17/10 | Internet | $5.00 |
| 10/14/10 | Internet | $5.00 |
| 11/15/10 | Internet | $5.00 |
| 12/11/10 | Internet | $5.00 |
| 01/29/11 | Internet | $5.00 |
| 02/18/11 | Internet | $5.00 |

**Figure 5** (showing the specific convenience fees Santander charged and collected from Plaintiff.)

29. Western Union kept a portion of the fees paid by Plaintiff and Santander kept the remainder. As such, the convenience fees that Plaintiff paid to make her Santander consumer debt payments exceeded any actual pass-through costs that Santander paid to third parties to process such payments. At no time was this fee sharing disclosed to Plaintiff.

30. Plaintiff was harmed by Santander's unlawful fee collections, in that she paid and lost amounts of money above and beyond what he legally owed pursuant to her debt agreements.

## CLASS ALLEGATIONS

31. Plaintiff Cheryl Johnson-Morris brings this action pursuant to 735 ILCS 5/2-801 on behalf of herself and the following Classes:

10

**FDCPA Class**: All individuals in the United States who: (i) paid a "convenience fee"; (ii) collected in whole or in part by Defendant; (iii) in order to make a payment on a non-commercial vehicle loan; (iv) where the term "convenience fee" was not specifically enumerated in the original agreement creating such debt; and (v) where Defendant's records indicate that the debt had not been current for 30 or more consecutive days at the time Defendant acquired its interested in it.

**Illinois Subclass**: All individuals in the FDCPA Class who reside in the State of Illinois.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

32. **Numerosity:** The exact sizes of the Classes are unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, thousands of consumers fall into the definitions of each of the Classes. Members of the Classes can be easily identified through Defendant's records.

33. **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff's and the Classes' claims, and those questions predominate over any questions that may affect individual members of the Classes. Plaintiff and the members of the Classes have all been harmed by the same conduct (*i.e.*, Defendant's unlawful collection of convenience fees), and all have claims based on a common application of the same subsection of

11

the same statute (*i.e.*, 15 U.S.C. § 1692f(1)). Common questions for the Classes include, but are not necessarily limited to the following:

    a.  Whether Defendant's conduct violated the FDCPA;

    b.  Whether Defendant systematically imposed fees and collected amounts not permitted by law; and

    c.  Whether the members of the Classes are entitled to additional statutory damages as a result of the frequency, persistence, and intentionality of Defendant's conduct.

    34.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's interests are the same as those of the other members of the Classes, in that her claims arise from the same misconduct and share the same essential characteristics as the claims belonging to the other members of the Classes. Plaintiff has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Classes.

    35.    **Appropriateness**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendant's actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendant.

Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

36. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

### FIRST CAUSE OF ACTION
### Violations of the FDCPA, 15 U.S.C. § 1692f
### (On Behalf of Plaintiff and the Classes)

37. Plaintiff incorporates the forgoing allegations as if fully set forth herein.

38. Plaintiff and the members of the Classes are natural persons obligated or allegedly obligated to pay debts arising from transactions that were primarily for personal, family, and/or household purposes, and as such are "consumers" within the meaning of 15 U.S.C. § 1692a(3).

39. Defendant acquired the rights to service or otherwise collect on the consumer debts of Plaintiff and the members of the Classes at times when such debts were in default. Further, Defendant regularly uses instrumentalities of interstate commerce to collect, directly and indirectly, debts owed or due or asserted to be owed or due another. As such, Defendant is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

40. Defendant used telephones and other instrumentalities of interstate commerce to employ unfair or unconscionable means to collect or attempt to collect debts. Among other things, Defendant charged and collected "convenience" fees to process certain consumer debt

13

payments made by Plaintiff and the members of the Classes. These fees, although collected incidentally to consumer debts of Plaintiff and the members of the Classes, were not expressly authorized by the original agreements creating such debts and were not specifically permitted by Illinois law. Accordingly, by charging such fees, Defendant explicitly or implicitly misrepresented that it had legal authority to collect such fees. Moreover, for any given payment transaction, the convenience fees charged by Defendant exceeded the incremental pass-through costs, if any, that third-party companies actually imposed on Defendant for the processing of such transaction.

41.    By collecting these fees, Defendant violated the FDCPA, 15 U.S.C. § 1692f, which prohibits debt collectors from using unfair means to collect or attempt to collect debts, and 15 U.S.C. § 1692f(1), which prohibits debt collectors from collecting "any amount" concerning a consumer debt unless such amount is "expressly authorized by the agreement creating the debt or permitted by law."

42.    Defendant's fee-collecting misconduct was frequent, persistent, and intentional.

43.    As a result of Defendant's unlawful conduct, the consumer debts owed by Plaintiff and the members of the Classes were, in effect, artificially enlarged, and they each paid and lost amounts of money above and beyond what they legally owed pursuant to their debt agreements.

44.    Accordingly, pursuant to 15 U.S.C. § 1692k, Plaintiff and the members of the Classes are each entitled to, *inter alia*, actual damages, costs, and attorneys' fees, as well as additional statutory damages of up to $1,000 each.

14

## SECOND CAUSE OF ACTION
### Autodialer Violations of the TCPA, 47 U.S.C. § 227
### (Individually by Plaintiff)

45.     Plaintiff incorporates the forgoing allegations as if fully set forth herein.

46.     Defendant and/or its agents made dozens of unsolicited phone calls to a wireless telephone number subscribed to and customarily used by Plaintiff.

47.     These calls were made using equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, *en masse*, simultaneously and without human intervention.

48.     These calls were made to Plaintiff without her wireless number being provided to Defendant in connection with her debt and without her prior express consent.

49.     Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's illegal conduct, she suffered damages in the form of any monies paid to receive unsolicited calls on her cellular phone and, under section 227(b)(3)(B), is entitled to, *inter alia*, a minimum of $500.00 in damages for each violation of such Act.

50.     Should the Court determine that Defendant's misconduct was willful and knowing, the Court may, pursuant to section 227(b)(3), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Class.

## THIRD CAUSE OF ACTION
### Prerecorded Voice Violations of the TCPA, 47 U.S.C. § 227
### (Individually by Plaintiff)

51.     Plaintiff incorporates the forgoing allegations as if fully set forth herein.

52.     Defendant and/or its agents made dozens of unsolicited phone calls to a wireless telephone number subscribed to and customarily used by Plaintiff.

53.     These calls featured artificial or prerecorded voices.

15

54.     These calls were made to Plaintiff without her wireless number being provided to Defendant in connection with her debt and without her prior express consent.

55.     Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's illegal conduct, she suffered damages in the form of any monies paid to receive unsolicited calls on her cellular phone and, under section 227(b)(3)(B), is entitled to, *inter alia*, a minimum of $500.00 in damages for each violation of such Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Cheryl Johnson-Morris, individually and on behalf of the Classes, prays for the following relief:

A.      An order certifying the Classes as defined above, appointing Plaintiff Cheryl Johnson-Morris as the representative of the Classes, and appointing her counsel as counsel for the Classes;

B.      An award of actual and statutory damages;

C.      An injunction requiring Defendant to cease all unlawful fee-charging conduct, and otherwise protecting the interests of the Classes;

D.      An award of reasonable attorneys' fees and costs; and

E.      Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

**CHERYL JOHNSON-MORRIS,** individually and
on behalf of all similarly situated individuals,

Dated: December 18, 2015

By: _____
One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
J. Dominick Larry
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

John E. Norris*
jnorris@davisnorris.com
Frank Davis*
fdavis@davisnorris.com
DAVIS & NORRIS, LLP
2154 Highland Avenue South
Birmingham, Alabama 35205
Tel: 205.930.9900
Fax: 205.930.9989

* *Pro hac vice* admission to be filed.

*Counsel for Plaintiff and the Classes.*

17

# Exhibit 1

**FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your downpayment of $ |
|---|---|---|---|---|
| 17.95 % | $ 15,612.66 | $ 23,937.00 | $ 39,549.60 | $ 40,549.60 |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | $ 549.30 | monthly beginning 02/24/05 |
| | $ | |

**Security:** You are giving a security interest in the goods being purchased and in any moneys, credits or other property of yours in the possession of the Assignee, on deposit or otherwise.

**Late Charge:** If any payment is not paid within the first (10) days after it is due, you will be charged 5% of the installment is in excess of $200.00; or 4) $10.00 if the installment is for $200.00 or less.

**Prepayment:** You have the right to prepay the unpaid balance in full or in part at any time without penalty.

See your contract terms below and on the reverse side for any additional information about repayment, default, any required repayment in full before the scheduled date, prepayment refunds and penalties and further information about security interests.

| Cash Price | $ 22,244.00 |
|---|---|
| Less Cash Downpayment | $ 1,000.00 |
| Trade-in | N/A |
| Year/Make/Model Trade-in | N/A |
| Net Trade-in | N/A |
| Deferred Downpayment | N/A |
| Unpaid Balance of Cash Price | $ 21,244.00 |
| "WE BUY SO RETURNS & PORTION OF THIS AMOUNT" | |
| Unpaid Balance Due on Trade-in | $ N/A |
| Year, Make, Model of Buyer's Trade-in | |
| (Paid to) | N/A |
| *Insurance Companies | $ N/A |
| ENTERPRISE • JACOBS | N/A |
| CAP — JACOBS TWIN | 500.00 |
| Public Officials (Licenses, Title & Taxes) | $ 2,138.00 |
| DOC FEE | $ 55.00 |
| N/A | N/A |
| N/A | N/A |
| N/A | N/A |

Buyer(s) CHERYL JOHNSON MORRIS 1930 N SPAULDING CHICAGO IL 60647
(Names) (Residence Address) (City) (State) (Zip)

Buyer(s) _____ (Names) _____ (Residence Address) _____ (City) (State) (Zip)

Seller JACOBS TWIN HONDA 6750 N GRAND AVE CHICAGO IL 607072297
(Corporate Name or Trade Name) (Business Address) (City) (State) (Zip)

Seller hereby sells and Buyer or Buyers, jointly and severally, hereby purchase the following motor vehicle with accessories and equipment thereon for the deferred payment price and on the terms set forth in this contract. Buyer acknowledges delivery and acceptance of said motor vehicle in good condition.

| New or Used | Year | Make of Vehicle | Model | Body Style | Alt. Cyl. | Serial Number | Body Color | Top Color | Key No. |
|---|---|---|---|---|---|---|---|---|---|
| USED | 2003 | FORD | ESCAPE | 4DR SPTUTV | | 1FMCU94183KD48902 | | | |

Buyer promises to pay to the order of Seller at the offices at: _____

**SEE REVERSE HEREOF FOR INFORMATION ON POSSIBLE REFUND OF CREDIT LIFE OR DISABILITY INSURANCE PREMIUM.**

NOTICE OF PROPOSED GROUP CREDIT LIFE INSURANCE

NOTICE TO BUYER: 1. Do not sign this agreement before you read it or if it contains any blank spaces. 2. You are entitled to an exact copy of the agreement you sign. 3. Under the law you have the right, among others, to pay in advance the full amount due and to obtain under certain conditions a partial refund of the finance charge. Buyer acknowledged receipt of a fully completed copy of this contract executed by both Seller and Buyer, Guarantor, if any, acknowledged receipt of completed copies of this contract and of Explanation of Guarantor's Obligation.

Dated: 1/10/05

JACOBS TWIN HONDA

**RETAIL INSTALLMENT CONTRACT**

1. Waiver of any default in the payment of any installment of the price or any other sum due hereunder, or of any other performance of any obligation hereunder, or any part hereof, or of any other modification of the terms of this contract shall be binding on holder unless written consent thereto is given by an executive officer or holder. This contract shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns.

2. Buyer agrees to keep said motor vehicle fully insured against loss by fire, theft and collision for the entire term of this contract in companies acceptable to holder. Holder is authorized to purchase all insurance included in this contract. Insurance coverages, other than required insurance, have been voluntarily contracted for by Buyer. Buyer may elect to purchase any required insurance from an insurance company, agent or broker of his own choice. If Buyer so elects, he shall furnish Seller with a policy or binder issued by a company acceptable to Seller on or before taking possession of the motor vehicle, and inclusion of Buyer's premiums in this contract is optional with Seller. All policies procured by Buyer shall render said loss, if any, shall be payable to Buyer and to the holder of this contract, as their respective interests may appear and a clause requiring insurer to give the holder 10 days written notice of cancellation in the event of the failure of Buyer to obtain said motor vehicle or to renew a fully paid policy to holder at the earliest hereto provided, or in the event of cancellation or expiration of any policy during the term of this contract without replacement by Buyer within 10 days, such failure shall constitute an event of default hereunder. Holder shall have the option, but shall not be required, to procure such insurance for Buyer and to advance the premium therefor. Buyer hereby promises to pay any such premium with finance charge thereon at the annual percentage rate stated on the reverse side hereof as an additional indebtedness due hereunder. Buyer hereby assigns to holder the proceeds of all insurance on said motor vehicle including unearned premium returns. In the event of default by Buyer hereunder, holder is authorized to cancel said insurance, remove or return all unearned premiums and to endorse any check or draft therefor made payable to Buyer. Any unearned premium received by the holder shall be credited to the debt, satisfying installments of this contract except to the extent applied toward payment for credit insurance protecting the interest of Buyer and the holder, or either of them.

3. COLLATERAL PROTECTION INSURANCE. Unless you provide us with evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interest in your collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may later cancel any insurance purchased by us, but only after providing us with evidence that you have obtained insurance as required by our agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to your total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.

4. Buyer shall not use or permit said motor vehicle to be used in violation of any law or ordinance. State, Federal, or Municipal. Buyer shall not ask, lease, encumber or place said motor vehicle in any other person's possession or remove it from the State of Illinois without the written consent of the holder of this contract. Buyer shall not use said motor vehicle for hire or as a taxi. Buyer shall keep said motor vehicle free from all mechanic's liens, tax liens and all other liens.

5. Upon the occurrence of any event of default, the holder of this contract shall have it's rights and remedies provided by Article 9 of the Illinois Uniform Commercial Code including, but not by way of limitation, the right of the holder (a) to take immediate possession of the motor vehicle, with or without judicial process, and for such purpose, to enter upon the premises where it may be located, and (b) to give Buyer reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other intended disposition thereof is to be made, and (c) to dispose of the motor vehicle at public or private sale in accordance with said notice to Buyer and to buy at a public sale; and (d) to pay the proceeds of sale first to the reasonable expenses of retaking, holding, preparing for sale and selling and to reasonable attorneys' fees and legal expenses incurred by holder, and second, to satisfaction of Buyer's indebtedness hereon, and third, to satisfaction of any subordinate security interest in the motor vehicle if demand therefor is received by holder after disposition of the proceeds, and to account to Buyer for any surplus remaining. Buyer shall be liable for any deficiency. If the Buyer has paid an amount equal to 50% or more of the deferred payment price at the time of repossession, the Buyer may, within 21 days, redeem the collateral from the holder by tendering (i) the total of all unpaid amounts, plus (ii) any default other than non-payment of the unpaid principal balance, plus (iii) any expenses reasonably incurred by holder in retaking, holding, and preparing the collateral for disposition, and (iv) reasonable attorneys' fees and legal expenses if expressly agreed by Buyer, that the requirements of this sub-section. At any time before disposition of the motor vehicle as provided herein, Buyer may redeem it by paying holder all indebtedness secured hereby as well as expenses reasonably incurred by holder in retaking, holding, preparing the motor vehicle for sale, arranging for the sale and reasonable attorneys' fees and legal expenses if expressly agreed by Buyer, that the requirements of this sub-section. All rights and remedies of the holder shall be cumulative and in no event a failure or neglect of holder to enforce, or the holder's delay in enforcing, any of the rights, remedies or powers herein provided, be deemed a waiver of such rights, remedies or powers, whether arising under the contract or otherwise.

6. Holder is authorized to apply any payment made by Buyer hereon to any other indebtedness of Buyer to holder, whether arising under the contract or otherwise.

7. Buyer agrees that holder, in retaking said motor vehicle as herein provided, may take possession of personal effects and property found therein and hold the same for delivery to Buyer.

8. Buyer agrees that if delivery of the motor vehicle is not made at the time of execution of this contract, the identifying number or marks and the due date of the first installment may be inserted by Seller in Seller's counterpart of the contract after it has been signed by Buyer.

9. If any provision of this contract is held invalid, the invalidity shall not affect the remaining provisions thereof.

---

**"NOTICE OF POSSIBLE REFUND OF CREDIT LIFE OR DISABILITY INSURANCE PREMIUM."**

**1) IF YOU HAVE PURCHASED EITHER CREDIT LIFE OR CREDIT DISABILITY INSURANCE, OR BOTH, TO GUARANTEE PAYMENTS BEING MADE IN CASE OF YOUR DEATH OR DISABILITY, ON YOUR VEHICLE PURCHASED UNDER AN INSTALLMENT SALES CONTRACT, YOU MAY BE ENTITLED TO A PARTIAL REFUND OF YOUR PREMIUM IF YOU PAY OFF YOUR INSTALLMENT/LOAN EARLY. (2) IN CASE OF EARLY COMPLETE PAYMENT OF YOUR LOAN, YOU SHOULD CONTACT THE SELLER OF YOUR CREDIT LIFE OR CREDIT DISABILITY INSURANCE TO SEE IF A REFUND IS DUE. IF YOUR VEHICLE DEALER FINANCED YOUR LOAN, THE SELLER OF YOUR CREDIT LIFE OR CREDIT DISABILITY INSURANCE IS YOUR VEHICLE DEALER.**

---

**ASSIGNMENT**

FOR VALUE RECEIVED, Seller hereby sells, assigns and transfers to _____

(Name of Assignee)                                        (Address of Assignee)

ASSIGNEE, its successors and assigns, all of Seller's right, title and interest in and to the within contract and the motor vehicle described therein. To induce Assignee to purchase said contract, Seller represents and warrants to Assignee (1) that the within contract is valid and genuine and correctly states the terms of the retail installment transaction between Seller and Buyer; (2) that the motor vehicle described has been delivered to and accepted by the Buyer; (3) that the down payment was paid in full, in cash or in trade, and that no part was loaned to Buyer by Seller; (4) that Seller had good title to and the right to sell said motor vehicle to Buyer and that the motor vehicle is free of all liens, claims and encumbrances; (5) that prior notice of any defense or right of action has been received by Seller from Buyer nor has Seller any knowledge of any fact which would impair the validity of the contract; (6) that Seller has the right to sell and assign this contract to Assignee; (7) that all buyers have legal capacity to contract; (8) that on the date of the contract Seller complied with all requirements of the Federal Truth in Lending Act, Regulation Z, the Federal/Credit Credit Opportunity Act and the Illinois Motor Vehicle Retail Installment Sales Act and the regulations of all governmental agencies; (9) that on the date of the contract, Seller assigned to Buyer the insurance coverages set out in the contract by Assignee showing correctly the date of the issued covering said motor vehicle, proceeds thereof constitute a valid security interest in the motor vehicle and the amount of said lien and caused to be delivered to the Secretary of within contract, the name and address of Assignee as holder of the lien set on the motor vehicle and the amount of said lien and caused to be delivered to the Secretary of State of Illinois all of the documents described with the prescribed fee; (11) that the motor vehicle has not been used as a taxi or for hire or for commercial transportation or by law enforcement agencies; (12) that the sale was made at Seller's place of business and was not a door-to-door sale within the definition of the Federal Trade Commission Trade Regulation Rule or the Illinois Consumer Fraud Act; and (13) that the Seller before the Buyer (if so of good moral character) certified Buyer with his lawful permissible vehicle to be used for unlawful purposes. If any of the foregoing representations and warranties if breached, Seller agrees to repurchase the within contract for the unpaid balance then due from Buyer thereon, together with reasonable attorneys' fees, costs and expenses incurred by Assignee.

Dated: ___1-25-05___

By: _____

                    Authorized Signature                                    Title

---

**REPURCHASE AGREEMENT (Execute Assignment Also)**

In Addition to Seller's obligations set forth in the above assignment, Seller agrees, in the event a claim or defense is asserted against Assignee by the Buyer at any time, Seller shall, on demand, repurchase the within contract for cash at a price equal to the net amount remaining unpaid on said contract; and Seller shall indemnify and hold Assignee harmless from any and all liabilities that may result in any time from any claim asserted by Buyer for recovery of amounts paid arising out of any promise, representation or warranty made by Seller or the manufacturer to Buyer.

Dated: _____

By: _____

                    Authorized Signature                                    Title

---

**FULL RECOURSE AGREEMENT (Execute Assignment Also)**

In Addition to Seller's obligations to set forth in the above assignment, Seller unconditionally guarantees prompt and full payment by Buyer of the Total of Payments and all other amounts due from Buyer under the within contract. If Buyer shall fail to pay any installment when due, Seller agrees to pay to Assignee, on demand, the full amount remaining unpaid on said contract. Seller agrees that it shall not be necessary for Assignee to proceed first against Buyer or to have recourse to the motor vehicle before proceeding to enforce this agreement. Extension of the time of payment or variation of terms effected by Assignee with Buyer shall not release Seller from his obligation hereunder.

Dated: _____

By: _____

                    Authorized Signature                                    Title

---

**LIMITED REPURCHASE AGREEMENT (Execute Assignment Also)**

In Addition to Seller's obligations set forth in the above assignment, Seller agrees, in the event that Assignee repossesses the motor vehicle described in the within contract on account of default by Buyer and delivers the same to Seller, Seller shall, on demand, repurchase said motor vehicle for cash at a price equal to the amount remaining unpaid on said contract plus all costs and expenses, including attorneys' fees, incurred by Assignee by reason of Buyer's default or in connection with repossession and delivery of the motor vehicle. This repurchase agreement shall remain in effect until Buyer has paid _____ full installments of the Total of Payments. Extension of the time of payment or variation of terms effected with the Buyer shall not release Seller from his obligation hereunder.

Dated: _____

By: _____

                    Authorized Signature                                    Title

---

**LIMITED GUARANTEE AGREEMENT (Execute Assignment Also)**

In Addition to Seller's obligations set forth in the above assignment, Seller unconditionally guarantees that, in the event of default by the Buyer in the full payment of any installment of the within contract when due, Seller will pay to Assignee, on demand, the unpaid balance then due on the contract up to the limit of $_____. This guarantee shall remain in effect until Buyer has paid _____ full scheduled installments on the Total of Payments. Extension of the times of payment or variation of terms effected by Assignee with Buyer shall not release Seller from his obligation hereunder.

Dated: _____

By: _____

                    Authorized Signature                                    Title

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

CHERYL JOHNSON-MORRIS, individually
and on behalf of all others similarly situated,

        *Plaintiff,*

v.

SANTANDER CONSUMER USA INC., an
Illinois corporation,

        *Defendant.*

Case No. 2015. CH 18352

## PLAINTIFF'S MOTION FOR AND MEMORANDUM
## IN SUPPORT OF CLASS CERTIFICATION

Plaintiff Cheryl Johnson-Morris, by and through her undersigned counsel, hereby

respectfully moves the Court for an Order certifying this case as a class action pursuant to

Section 2-801 of the Illinois Code of Civil Procedure, but requests that the Court enter and

continue the motion until after the completion of discovery on class-wide issues, at which time

Plaintiff will submit a more detailed memorandum of points and authorities in support of class

certification.[1]

## I.    INTRODUCTION.

This matter readily satisfies the prerequisites to class certification. Through a common

course of conduct, Defendant Santander Consumer USA Inc. ("Santander") imposed and

collected thousands of pay-to-pay "convenience" fees on the consumer debts of individuals

---

[1]    Plaintiff files this motin at the outset of litigation to prevent Defendant from attempting a so-called "buy off" to moot her representative claims (*i.e.*, attempting to moot her class claims by tendering to him the full amount of her individual claims). *See Barber v. Am. Airlines, Inc.*, 241 Ill. 2d 450, 459 (2011) (noting that under Illinois law, "a named plaintiff who files a motion for class certification *prior* to a Defendant's tender may avoid a mootness determination, at least until after the circuit court rules on the motion for class certification.").

1

nationwide—including Plaintiff and a proposed Class and Subclass of consumers (defined below)—despite its lack of express authorization to do so under any of the standard agreements used to create such debts. Through that common course of conduct, Defendant not only artificially enlarged the consumer debts owed by Plaintiff and the members of the Classes, but repeatedly violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA"), which prohibits debt collectors like Santander from collecting "*any* amount" incidental to a consumer debt unless "such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1) (emphasis added).

For these reasons and as discussed further herein, the proposed Classes readily satisfy the prerequisites to certification under Section 2-801, and the instant motion should therefore be granted in its entirety. Notwithstanding, Plaintiff respectfully requests that the Court: (1) enter and reserve ruling on her Motion for and Memorandum in Support of Class Certification; (2) allow for and schedule discovery to take place on class-wide issues; (3) grant her leave to file a supplemental memorandum in support of her Motion for Class Certification upon the conclusion of class-wide discovery; (4) grant her Motion for Class Certification after full briefing of the issues presented herein; and (5) provide all other and further relief that the Court deems reasonable and just.

## II.    FACTUAL BACKGROUND.

### A.    Facts Applicable to All Members of the Putative Classes.

Defendant Santander, an industry leader in "nonprime" auto loans, specifically targets consumers that have "a lack of or adverse credit history, low income levels and/or the inability to provide adequate down payments." (Compl. ¶ 1.) Many of Santander's loans were originated by other companies, and Santander often acquired its interests at times when such loans were in

2

default. (*Id.* ¶ 12-13.) Consequently, Santander services a disproportionate percentage of loans for consumers who have difficulty making their payments precisely when due. (*Id.* ¶ 2.)

Unfortunately, Santander capitalizes on these circumstances by steering distressed consumers into using unnecessary, high-fee services to make routine loan payments on fear of otherwise potentially losing what is often their primary means of transportation. (*Id.* ¶ 3.) It does so even when other methods of free, timely payments are otherwise available. (*Id.* ¶ 14-15.) The fees it charges are not pass-through costs reflective of actual third-party processing charges but rather are arbitrary amounts imposed at Santander's direction to drive excess profits for itself. (*Id.* ¶ 3.) Not surprisingly, these debt collection practices have led to significant consumer complaints. (*Id.* ¶ 16.)

However, the convenience fees that Santander imposed and collected were not expressly authorized by the original agreements creating the consumer debts and were not specifically permitted by law. (*Id.* ¶ 18.) As such, Defendant not only imposed and collected excessive and arbitrary fees from Plaintiff and members of the putative Classes, but also frequently, persistently, and intentionally violated the FDCPA.

**B.    Facts Applicable to Plaintiff Johnson-Morris.**

On January 11, 2005, Plaintiff purchased a 2003 Ford Escape at Jacobs Twin Buick in Chicago, Illinois. (*Id.* ¶ 19.) She purchased this vehicle primarily for personal and household use, and financed this purchase through a consumer loan with HSBC Finance Corporation. (*Id.*) Santander did not originate this loan, but eventually acquired the rights to collect Plaintiff's payments at a time when her loan was considered in default. (*Id.* ¶¶ 19-23.) In order to make routine loan payments, Plaintiff ultimately paid several "convenience fees" to Santander through a program that Santander implemented in partnership with Western Union. (*Id.* ¶¶ 23, 27-30.)

3

Santander and Western Union split these fees, with a portion going to each and with both companies profiting from each transaction. (*Id.*) As such, the convenience fees that Plaintiff paid to make her Santander consumer debt payments exceeded any actual pass-through costs that Santander paid to third parties to process such payments, and instead served as arbitrary profit drivers for Santander. (*Id.*) At no time was the fee split between Santander and Western Union disclosed. (*Id.*)

The convenience fees that Plaintiff paid and that Santander collected were neither authorized in the original agreement that created Plaintiff's consumer debt nor specifically permitted by law. (*Id.*) As such, Plaintiff paid and lost money above and beyond what she legally owed pursuant to her original debt agreements. (*Id.*)

### C.    The Proposed Classes.

As a result of Defendant's conduct described above, Plaintiff Johnson-Morris brought this lawsuit and now seeks certification of a Class and Subclass of similarly situated individuals, defined as follows:[2]

> **FDCPA Class:** All individuals in the United States who: (i) paid a "convenience fee"; (ii) collected in whole or in part by Defendant; (iii) in order to make a payment on a non-commercial vehicle loan; (iv) where the term "convenience fee" was not specifically enumerated in the original agreement creating such debt; and (v) where Defendant's records indicate that the debt had not been current for 30 or more consecutive days at the time Defendant acquired its interested in it.

---

[2]    The following are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

**Illinois Subclass**: All individuals in the FDCPA Class who reside in the State of Illinois.

(*Id.* ¶ 31.) As demonstrated below, the proposed Classes meet each of the prerequisites for certification under Section 2-801 and therefore, the instant motion should be granted in its entirety.

## III.    THE PROPOSED CLASSES SATISFY EACH OF THE REQUIREMENTS FOR CERTIFICATION.

Certifying a class in Illinois requires the plaintiff to establish that: "(1) [t]he class is so numerous that joinder of all members is impracticable[;] (2) [t]here are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members[;] (3) [t]he representative parties will fairly and adequately protect the interest of the class[; and] (4) [t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801.

In determining whether to certify a proposed class, the Court need not decide whether the plaintiff will ultimately prevail on the merits. *See Chultem v. Ticor Title Ins. Co.*, 401 Ill. App. 3d 226, 237 (1st Dist. 2010) (citing *Cruz v. Unilock Chi., Inc.*, 383 Ill. App. 3d 752, 764 (2d Dist. 2008)) (finding that an issue that goes to the merits of the underlying actions "is not appropriate to be considered when examining the propriety of class certification"). Instead, for purposes of considering whether to grant certification, the Court should accept as true the allegations in the complaint, *Ramirez v. Midway Moving & Storage, Inc.*, 378 Ill. App. 3d 51, 53 (1st Dist. 2007) (quoting *Clark v. TAP Pharm. Prods., Inc.*, 343 Ill. App. 3d 538, 544–45 (5th Dist. 2003)), and "should err in favor of maintaining class [certifications]." *Id.* (quoting *Clark*, 343 Ill App. 3d at 545).

Here, the putative Classes are sufficiently numerous, each consisting of thousands of

individual members. The claims of Plaintiff and the members of the putative Classes are based on Defendant's common course of conduct, such that common issues will predominate over individualized ones. Plaintiff and her counsel are adequate representatives of the proposed Classes, with no potential conflicts or interests adverse to the Classes. And a class action is the most appropriate method to adjudicate the claims of all the members of the Classes, given the often small individual damages involved, the uniformity and widespread nature of Defendant's conduct, and the unlikelihood of the members of the Classes pursuing individual actions. Accordingly, this Court should grant class certification.

A.    **Numerosity: The Proposed Classes are Sufficiently Numerous and Likely Consists of Thousands of Individual Members.**

The first step in certifying a class is a showing that "the class is so numerous that joinder of all members is impracticable." 735 ILCS 5/2-801(1). This requirement is met when joining "such a large number of plaintiffs in a single suit would render the suit unmanageable and, in contrast, multiple separate claims would be an imposition on the litigants and the courts." *Gordon v. Boden*, 224 Ill. App. 3d 195, 200 (Ill. App. Ct. 1991) (citing *Steinberg v. Chicago Med. Sch.*, 69 Ill. 2d 320, 337 (1977)). "Plaintiffs need not demonstrate a precise figure for the class size, because a good-faith, nonspeculative estimate will suffice." *Cruz v. Unilock Chicago*, 383 Ill. App. 3d 752, 771 (Ill. App. Ct. 2008). Generally, "[t]he court is permitted to make common sense assumptions that support a finding of numerosity." *Maxwell v. Arrow Fin. Servs., LLC*, 2004 WL 719278, at *2 (N.D. Ill. March 31, 2004)[3] (citations omitted); *see also* 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 7.20, 66 (4th ed. 2001).

---

[3]    Because 735 ILCS 5/2-801 was patterned after Rule 23 of the Federal Rules of Civil Procedure, "federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 125 (2005).

Here, Plaintiff alleges—and discovery will show—that Defendant imposed unlawful convenience fees on thousands of individuals in Illinois and throughout the country. (Compl. ¶ 32.) An allegation that the proposed class consists of more than a thousand members provides "ample basis" to support the conclusion that the class is so numerous that joinder of all members is impracticable. *Carrao v. Health Care Serv. Corp.*, 118 Ill. App. 3d 417, 427 (1st Dist. 1983); *see also Tassan v. United Dev. Co.*, 88 Ill. App. 3d 581, 594 (1st Dist. 1980) (finding more than 150 potential claimants would satisfy numerosity); *Kulins v. Malco, A Microdot Co., Inc.*, 121 Ill. App. 3d 520, 530 (1st Dist. 1984) (finding even 35 class members could satisfy numerosity).

Further, even aside from the sheer numbers of potential Class members, joinder is impracticable and class certification is warranted because (1) the members of the proposed Classes are geographically dispersed; (2) the claims per person are often relatively small and unlikely to be the subject of litigation on an individual basis; and (3) the lawsuit seeks, *inter alia*, injunctive relief for Santander's statutory violations. *See Wood River Area Dev. Corp. v. Germania Fed. Sav. and Loan Ass'n*, 198 Ill. App. 3d 445, 451-53 (5th Dist. 1990).

Accordingly, the first prerequisite for class certification is met.[4]

### B. Commonality and Predominance: The Proposed Classes Share Common Questions of Law and Fact that Predominate Over Any Individual Issues.

Section 2-801's second prerequisite requires that there are "questions of fact or law common to the class" and that those questions "predominate over any questions affecting only individual members." 735 ILCS 5/2-801(2). Common questions of law or fact are typically found to exist when the members of a proposed class have been aggrieved by the same or similar misconduct. *See Miner v. Gillette Co.*, 87 Ill. 2d 7, 17 (1981); *Steinberg*, 69 Ill. 2d at 341;

---

[4]     To the extent the Court requires additional details regarding the number of members in the Class, such information may be readily obtained through discovery.

*McCarthy v. LaSalle Nat'l Bank & Trust Co.*, 230 Ill. App. 3d 628, 634 (Ill. Ct. App. 1992). After common questions of law or fact have been identified, these common questions must also predominate over any issues affecting only individual class members. *See O-Kay Shoes, Inc. v. Rosewell*, 129 Ill. App. 3d 405, 408 (Ill. Ct. App. 1984). Ultimately, commonality is a relatively low and easily surmountable hurdle. *See Scholes v. Stone, McGuire, & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131–132 (2009)).

Here, the claims of Plaintiff and the members of the Classes are based upon the same common contention: that Defendant violated the FDCPA by repeatedly imposing and collecting convenience fees even though the standard agreements originally entered into by the debtors *never* expressly authorized such fees. (Compl. ¶¶ 12-30.) Defendant collected these fees systematically and its conduct affected Plaintiff and the members of the Classes in a virtually identical manner (*i.e.*, subjecting them to the loss of money from paying amounts not lawfully owed). (*Id.*) Moreover, Defendant's unlawful conduct will be proven through the use of common and generalized evidence applicable to the Classes as a whole.

Defendant's conduct gives rise to several common questions of both law and fact. The common questions for the Classes include: (i) whether Defendant's conduct violated the FDCPA; (ii) whether Defendant systematically imposed fees and collected amounts not permitted by law; and (iii) whether the members of the Classes are entitled to additional statutory damages as a result of the frequency, persistence, and intentionality of Defendant's conduct. (*Id.*)

Accordingly, Section 2-801's commonality and predominance requirements are met.

**C.    Adequacy of Representation: Plaintiff and Her Counsel are Adequate Representatives and Have No Conflicts with the Members of the Classes.**

The third prerequisite of Section 2-801 requires that "[t]he representative parties will fairly and adequately protect the interest of the class." 735 ILCS 5/2-801(3). The purpose of the adequacy of representation requirement is "to insure that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim." *Purcell and Wardrope Chtd. v. Hertz Corp.*, 175 Ill. App. 3d 1069, 1078 (Ill. Ct. App. 1988); *Gordon*, 224 Ill. App. 3d at 203.

In this case, Plaintiff has the same interests as the proposed members of the Classes. They each paid excessive fees to Defendant as a result of Defendant's uniform course of unlawful conduct. (Compl. ¶ 12-30.) Thus, Plaintiff suffered the same injuries as the members of the Classes, has the same claims available to her, and has no interests antagonistic to those of the Classes. (*Id.*) She will fairly and adequately protect the interests of the Classes and her pursuit of the instant action demonstrates as much. (*Id.*)

Similarly, Plaintiff's counsel are well-respected members of the legal community, who have extensive experience in class actions of similar size, scope, and complexity to the instant action. (See Declaration of Benjamin H. Richman ¶¶ 4-5, a true and accurate copy of which is attached hereto as Exhibit 1.) Indeed, proposed class counsel have been recognized as leaders in consumer class action litigation by courts, legislatures, and international media groups, and have been appointed as lead counsel in a number of high-profile cases consumer finance cases, including *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, No. 10-cv-3647 (N.D. Ill.), *Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152-CW (N.D. Cal.) *In re Citibank HELOC Reduction Litig.*, No. 09-cv-0350-MMC (N.D. Cal.), and *Wigod v. Wells Fargo*, No. 10-

9

cv-2348 (N.D. Ill.).

Moreover, proposed class counsel have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead class counsel by courts throughout the country. (See Richman Declaration at ¶¶ 4-6; *see also* Firm Resume of Edelson PC, a true and accurate copy of which is attached as Exhibit 1-A to the Richman Declaration.) Proposed class counsel have already diligently investigated the claims at issue in this action and dedicated substantial resources to the case, and they will continue to do so throughout its pendency. (Id. ¶ 6.)

Thus, the adequacy of representation requirement is satisfied as well.

### D. Appropriateness: This Class Action is the Most Appropriate Method to Adjudicate the Claims at Issue.

The final prerequisite to class certification is met where "[t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801(4). "In applying this prerequisite in a particular case, a court considers whether a class action: (1) can best secure the economies of time, effort and expense, and promote uniformity; or (2) accomplish the other ends of equity and justice that class actions seek to obtain." *Gordon*, 224 Ill. App. 3d at 203. In practice, a "holding that the first three prerequisites of section 2-801 are established makes it evident that the fourth requirement is fulfilled." *Id.* at 204; *Purcell and Wardrope Chtd.*, 175 Ill. App. 3d at 1079 ("[T]he predominance of common issues [may] make a class action . . . a fair and efficient method to resolve the dispute."). Additionally, a "controlling factor in many cases is that the class action is the only practical means for class members to receive redress." *Gordon*, 224 Ill. App. 3d at 203; *Eshaghi v. Hanley Dawson Cadillac Co., Inc.*, 214 Ill. App. 3d 995, 1004 (Ill. App. Ct. 1991) ("In a large and impersonal society, class actions are often the last barricade of consumer protection.").

Under the circumstances of this case, a class action is the most appropriate method for the fair and efficient adjudication of the claims of Plaintiff and the proposed Classes. The injuries suffered by many of the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendant's conduct. (Compl. ¶ 35.) Thus, absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief. (*Id.*) Maintenance of this case as a class action is also appropriate because it would avoid the necessity for multiple adjudications of identical legal and factual issues, thereby reducing the burden on the parties and the judiciary. Likewise, the fact that Section 2-801's numerosity, commonality and predominance, and adequacy of representation requirements have been satisfied, further demonstrates the appropriateness of proceeding with this case as a class action.

Accordingly, Section 2-801's final prerequisite is satisfied and the proposed Classes warrant certification.

## IV. CONCLUSION.

For the reasons stated above, and which will be borne out by class discovery, this case is appropriate for class certification. Plaintiff Cheryl Johnson-Morris, individually and on behalf of the proposed Classes, respectfully requests that the Court: (1) enter and reserve ruling on her Motion for and Memorandum in Support of Class Certification; (2) allow for and schedule discovery to take place on class-wide issues; (3) grant her leave to file a supplemental memorandum in support of her Motion for Class Certification upon the conclusion of class-wide discovery; (4) grant her Motion for Class Certification after full briefing of the issues presented herein; and (5) provide all other and further relief that the Court deems reasonable and just.

11

Respectfully Submitted,

**CHERYL JOHNSON-MORRIS**,
individually and on behalf of all others
similarly situated,

Dated: December 18, 2015

By: _____
One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
J. Dominick Larry
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
Firm ID: 44146

John E. Norris*
jnorris@davisnorris.com
Frank Davis*
fdavis@davisnorris.com
DAVIS & NORRIS, LLP
2154 Highland Avenue South
Birmingham, Alabama 35205
Tel: 205.930.9900
Fax: 205.930.9989

* *Pro hac vice* admission to be filed.

*Counsel for Plaintiff and the Classes.*

12

# Exhibit 1

## DECLARATION OF BENJAMIN H. RICHMAN
## IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

I, Benjamin H. Richman, hereby declare and state as follows:

1.     I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated. If called to testify as to the matters stated herein, I could and would competently do so.

2.     I am an attorney at the law firm of Edelson PC, which has been retained to represent the named Plaintiff in this matter, Cheryl Johnson-Morris.

3.     Attached hereto as Exhibit 1-A is a true and accurate copy of the firm resume of Edelson PC.

4.     As shown in Exhibit 1-A, Edelson PC has significant experience prosecuting consumer class actions and complex litigation of a similar nature, scope, and complexity to the instant case.

5.     Edelson PC and its attorneys have regularly engaged in major complex litigation involving consumer rights and statutory violations, have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead class counsel by courts throughout the country.

6.     To date, Edelson PC and its attorneys have diligently investigated, prosecuted, and dedicated substantial resources to the claims in this matter, and will continue to do so throughout its pendency.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed this December 18, 2015, at Chicago, Illinois.

Benjamin H. Richman

# Exhibit 1-A

## EDELSON PC FIRM RESUME

EDELSON PC is a plaintiffs' class action and commercial litigation firm with attorneys in Illinois and California.

Our attorneys have been recognized as leaders in these fields by state and federal courts, legislatures, national and international media groups, and our peers. Our reputation has led state and federal courts across the country to appoint us lead counsel in many high-profile cases, including in cutting-edge privacy class actions against comScore, Netflix, Time, Microsoft, and Facebook; Telephone Consumer Protection Act class actions against technology, media, and retail companies such as Google, Twentieth Century Fox, Simon & Schuster, and Steve Madden; data security class actions against LinkedIn and AvMed; banking cases against Citibank, Wells Fargo, and JP Morgan Chase related to reductions in home equity lines of credit; fraudulent marketing cases against software companies such as Symantec and Ascentive; mobile content class actions against all major cellular telephone carriers; and product liability cases, including the Thomas the Tank Engine lead paint class actions and the tainted pet food litigation.

We have testified before the United States Senate on class action issues and have repeatedly been asked to work on federal and state legislation involving cellular telephony, privacy, and other consumer issues. Our attorneys have appeared on dozens of national and international television and radio programs to discuss our cases and class action and consumer protection issues more generally. Our attorneys speak regularly at seminars on consumer protection and class action issues, lecture on class actions at law schools, and serve as testifying experts in cases involving class action and consumer issues.

## PLAINTIFFS' CLASS AND MASS ACTION PRACTICE GROUP

EDELSON PC is a leader in plaintiffs' class and mass action litigation, with a specialized focus on consumer technology. Our firm is "known for securing multi-million dollar settlements against tech giants" (Chicago Daily Law Bulletin, September 2013), and has been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *See In re Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal. Dec. 10, 2010) (order appointing us interim co-lead of privacy class action); *see also In re Netflix Privacy Litig.*, No. 11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing us sole lead counsel due, in part, to our "significant and particularly specialized expertise in electronic privacy litigation and class actions. . . ."). We have also been recognized by courts for our uniquely zealous and efficient approach to litigation, which lead the then-Chief Judge of the United States Court for the Northern District of Illinois to praise our work as "consistent with the highest standards of the profession" and "a model of what the profession should be. . . ." *In re Kentucky Fried Chicken Coupon Marketing & Sales Practices Litig.*, No. 09-cv-7670, MDL 2103 (N.D. Ill. Nov. 30, 2011). Likewise, in appointing our firm interim co-lead in one of the most high profile banking cases in the country, a federal court pointed to our ability to be "vigorous advocates, constructive problem-solvers, and civil with their adversaries." *In Re JPMorgan Chase Home Equity Line of Credit Litig.*, No. 10 C 3647 (N.D. Ill. July 16, 2010). After hard fought litigation, that case settled, resulting in the reinstatement of between $3.2 billion and $4.7 billion in home credit lines. In addition, the firm is uniquely able to try cases, especially those involving sophisticated technology issues. Lead by a deputy chief of the

cybercrime unit for the United States Attorney's Office, our trial team has handled both jury and bench trials on issues ranging from general consumer matters to complex cyber crimes (including hacking and cyber intrusions, data breaches, and large-scale identity theft cases) that rested on sophisticated computer forensics.

We have several sub-specialties within our plaintiffs' class action practice:

## PRIVACY/DATA LOSS

### Data Loss/Unauthorized Disclosure of Data

We have litigated numerous class actions involving issues of first impression against Facebook, Apple, Netflix, Sony, Redbox, Pandora, Sears, Storm 8, Google, T-Mobile, Microsoft, and others involving failures to protect customers' private information, security breaches, and unauthorized sharing of personal information with third parties. Representative settlements and ongoing cases include:

- *Dunstan v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.): Lead counsel in certified class action accusing Internet analytics company of improper data collection practices. The court has finally approved a $14 million settlement.

- *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.): Lead counsel in data breach case filed against health insurance company. Obtained landmark appellate decision endorsing common law unjust enrichment theory, irrespective of whether identity theft occurred. Case also resulted in the first class action settlement in the country to provide data breach victims with monetary payments irrespective of identity theft.

- *In re Netflix Privacy Litigation*, No. 11-cv-00379 (N.D. Cal.): Sole lead counsel in suit alleging that defendant violated the Video Privacy Protection Act by illegally retaining customer viewing information. Case resulted in a $9 million dollar *cy pres* settlement that has been finally approved.

- *Halaburda v. Bauer Publishing Co.*, No. 12-cv-12831 (E.D. Mich.); *Grenke v. Hearst Communications, Inc.*, No. 12-cv-14221 (E.D. Mich.); *Fox v. Time, Inc.*, No. 12-cv-14390 (E.D. Mich.): Consolidated actions brought under Michigan's Preservation of Personal Information Act, alleging unlawful disclosure of subscribers' personal information. In a ground-breaking decision, the court denied three motions to dismiss finding that the magazine publishers were covered by the act and that the illegal sale of personal information triggers an automatic $5,000 award to each aggrieved consumer. In January and July of 2015, final approval was granted to a settlement reached in the *Bauer Publishing* matter and an adversarial class was certified in the *Time* case, respectively.

- *Standiford v. Palm*, No. 09-cv-05719-LHK (N.D. Cal.): Sole lead counsel in data loss class action, resulting in $640,000 settlement.

- *In re Zynga Privacy Litig.*, No. 10-cv-04680 (N.D. Cal.): Appointed co-lead counsel in suit against gaming application designer for the alleged unlawful disclosure of its users' personally identifiable information to advertisers and other third parties.

- *In re Facebook Privacy Litigation*, No. 10-cv-02389 (N.D. Cal.): Appointed co-lead counsel in suit alleging that Facebook unlawfully shared its users' sensitive personally identifiable information with Facebook's advertising partners.

- *In re Sidekick Litigation*, No. C 09-04854-JW (N.D. Cal.): Co-lead counsel in cloud computing data loss case against T-Mobile and Microsoft. Settlement provided the class with potential settlement benefits valued at over $12 million.

- *Desantis v. Sears*, No. 08 CH 00448 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in injunctive settlement alleging national retailer allowed purchase information to be publicly available through the Internet.

### Telephone Consumer Protection Act

Edelson has been at the forefront of TCPA litigation for over six years, having secured the groundbreaking *Satterfield* ruling in the Ninth Circuit applying the TCPA to text messages. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009). In addition to numerous settlements totaling over $100 million in relief to consumers, we have over two dozen putative TCPA class actions pending against companies including Santander Consumer USA, Inc., Walgreen Co., Path, Inc., Nuance Communications, Inc., Stonebridge Life Insurance, Inc., GEICO, DirectBuy, Inc., and RCI, Inc. Representative settlements and ongoing cases include:

- *Rojas v CEC*, No. 10-cv-05260 (N.D. Ill.): Lead counsel in text spam class action that settled for $19,999,400.

- *In re Jiffy Lube Int'l Text Spam Litigation*, No. 11-md-2261, 2012 WL 762888 (S.D. Cal.): Co-lead counsel in $35 million text spam settlement.

- *Ellison v Steve Madden, Ltd.*, No. cv 11-5935 PSG (C.D. Cal.): Lead counsel in $10 million text spam settlement.

- *Kramer v. B2Mobile*, No. 0-cv-02722-CW (N.D. Cal.): Lead counsel in $12.2 million text spam settlement.

- *Pimental v. Google, Inc.*, No. 11-cv-02585 (N.D. Cal.): Lead counsel in class action alleging that defendant co-opted group text messaging lists to send unsolicited text messages. $6 million settlement provides class members with an unprecedented $500 recovery.

- *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D. Cal.): Lead counsel in $10 million text spam settlement.

- *Miller v. Red Bull*, No. 12-CV-04961 (N.D. Ill.): Lead counsel in $6 million text spam settlement.

- *Woodman v. ADP Dealer Services*, No. 2013 CH 10169 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in $7.5 million text spam settlement.

- *Lockett v. Mogreet, Inc.*, No 2013 CH 21352 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in $16 million text spam settlement.

- *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill.): Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers. Case settled for $16 million.

- *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.): Co-lead counsel in in $10 million text spam settlement.

- *Weinstein v. Airit2me, Inc.*, No. 06 C 0484 (N.D. Ill): Co-lead counsel in $7 million text spam settlement.

## CONSUMER TECHNOLOGY

### *Fraudulent Software*

In addition to the settlements listed below, EDELSON PC has consumer fraud cases pending in courts nationwide against companies such as McAfee, Inc., Avanquest North America Inc., PC Cleaner, AVG, iolo Technologies, LLC, among others. Representative settlements include:

- *Drymon v. Cyberdefender*, No. 11 CH 16779 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.75 million.

- *Gross v. Symantec Corp.*, No. 12-cv-00154-CRB (N.D. Cal.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $11 million.

- *LaGarde v. Support.com, Inc.*, No. 12-cv-00609-JSC (N.D. Cal.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $8.59 million.

- *Ledet v. Ascentive LLC*, No. 11-CV-294-PBT (E.D. Pa.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.6 million.

- *Webb v. Cleverbridge, Inc.*, No. 1:11-cv-04141 (N.D. Ill.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $5.5 million.

### Video Games

EDELSON PC has litigated cases video-game related cases against Activision Blizzard Inc., Electronic Arts, Inc., Google, and Zenimax Media, Inc.

## MORTGAGE & BANKING

EDELSON PC has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of the banks. Our suits include claims that certain banks unlawfully suspended home credit lines based on pre-textual reasons, and that certain banks have failed to honor loan modification programs. We achieved the first federal appellate decision in the country recognizing the right of borrowers to enforce HAMP trial plans under state law. The court noted that "[p]rompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J., concurring). Our settlements have restored billions of dollars in home credit lines to people throughout the country. Representative cases and settlements include:

- *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, No. 10-cv-3647 (N.D. Ill.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines. Settlement restored between $3.2 billion and $4.7 billion in credit to the class.

- *Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152-CW (N.D. Cal.): Lead counsel in class actions challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restores access to over $1 billion in credit and provides industry leading service enhancements and injunctive relief.

- *In re Citibank HELOC Reduction Litig.*, No. 09-cv-0350-MMC (N.D. Cal.): Lead counsel in class actions challenging Citibank's suspensions of home equity lines of credit. The settlement restored up to $653,920,000 worth of credit to affected borrowers.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D. Ill.): In ongoing putative class action, obtained first appellate decision in the country recognizing the right of private litigants to sue to enforce HAMP trial plans.

### GENERAL CONSUMER PROTECTION CLASS ACTIONS

We have successfully prosecuted countless class actions against computer software companies, technology companies, health clubs, dating agencies, phone companies, debt collectors, and other businesses on behalf of consumers. In addition to the settlements listed below, EDELSON PC have litigated consumer fraud cases in courts nationwide against companies such as Motorola Mobility, Stonebridge Benefit Services, J.C. Penney, Sempris LLC, and Plimus, LLC. Representative settlements include:

#### *Mobile Content*

We have prosecuted over 100 cases involving mobile content, settling numerous nationwide class actions, including against industry leader AT&T Mobility, collectively worth over a hundred million dollars.

- *McFerren v. AT&T Mobility, LLC*, No. 08-CV-151322 (Fulton Cnty. Super. Ct., Ga.): Lead counsel class action settlement involving 16 related cases against largest wireless service provider in the nation. "No cap" settlement provided virtually full refunds to a nationwide class of consumers who alleged that unauthorized charges for mobile content were placed on their cell phone bills.

- *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving 27 related cases alleging unauthorized mobile content charges. Case settled for $36 million.

- *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Case settled for $12 million.

- *Parone v. m-Qube, Inc.*, No. 08 CH 15834 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving over 2 dozen cases alleging the imposition of unauthorized mobile content charges. Case settled for $12.254 million.

- *Williams v. Motricity, Inc.*, No. 09 CH 19089 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving 24 cases alleging the imposition of unauthorized mobile content charges. Case settled for $9 million.

- *VanDyke v. Media Breakaway, LLC*, No. 08 CV 22131 (S.D. Fla.): Lead counsel in class action settlement alleging unauthorized mobile content charges. Case settled for $7.6 million.

- *Gresham v. Cellco Partnership*, No. BC 387729 (L.A. Super. Ct., Cal.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Settlement provided class members with full refunds.

- *Abrams v. Facebook, Inc.*, No. 07-05378 (N.D. Cal.): Lead counsel in injunctive settlement concerning the transmission of allegedly unauthorized mobile content.

### *Deceptive Marketing*

- *Van Tassell v. UMG*, No. 1:10-cv-2675 (N.D. Ill.): Lead counsel in negative option marketing class action. Case settled for $2.85 million.

- *McK Sales Inc. v. Discover Bank*, No. 10-cv-02964 (N.D. Ill.): Lead counsel in class action alleging deceptive marketing aimed at small businesses. Case settled for $6 million.

- *Farrell v. OpenTable*, No. 11-cv-01785 (N.D. Cal.): Lead counsel in gift certificate expiration case. Settlement netted class over $3 million in benefits.

- *Ducharme v. Lexington Law*, No. 10-cv-2763 (N.D. Cal): Lead counsel in CROA class action. Settlement resulted in over $6 million of benefits to the class.

- *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

- *Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

- *Kim v. Riscuity*, No. 06 C 01585 (N.D. Ill.): Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

- *Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D. Ill.): Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

- *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3 million.

- *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1.6 million and $4.8 million.

- *Zurakov v. Register.com,* No. 01-600703 (N.Y. Sup. Ct., N.Y. Cnty.): Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its allegedly deceptive practices in advertising on "coming soon" pages of newly registered Internet domain names. Settlement required Register.com to fully disclose its practices and provided the class with relief valued in excess of $17 million.

## PRODUCTS LIABILITY CLASS ACTIONS

We have been appointed lead counsel in state and federal products liability class settlements, including a $30 million settlement resolving the "Thomas the Tank Engine" lead paint recall cases and a $32 million settlement involving the largest pet food recall in the history of the United States and Canada. Representative settlements include:

- *Barrett v. RC2 Corp.*, No. 07 CH 20924 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provided class with full cash refunds and reimbursement of certain costs related to blood testing.

- *In re Pet Food Products Liability Litig.*, No. 07-2867 (D.N.J.): Part of mediation team in class action involving largest pet food recall in United States history. Settlement provided $24 million common fund and $8 million in charge backs.

## INSURANCE CLASS ACTIONS

We have prosecuted and settled multi-million dollar suits against J.C. Penney Life Insurance for allegedly illegally denying life insurance benefits under an unenforceable

policy exclusion and against a Wisconsin insurance company for terminating the health insurance policies of groups of self-insureds. Representative settlements include:

- *Holloway v. J.C. Penney,* No. 97 C 4555 (N.D. Ill.): One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to the class. The case settled in or around December 2000, resulting in a multi-million dollar cash award to the class.

- *Ramlow v. Family Health Plan* (Wisc. Cir. Ct., WI): Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

## MASS/CLASS TORT CASES

Our attorneys were part of a team of lawyers representing a group of public housing residents in a suit based upon contamination related injuries, a group of employees exposed to second-hand smoke on a riverboat casino, and a class of individuals suing a hospital and national association of blood banks for failure to warn of risks related to blood transfusions. Representative settlements include:

- *Aaron v. Chicago Housing Authority,* No. 99 L 11738 (Cir. Ct. Cook Cnty., Ill.): Part of team representing a group of public housing residents bringing suit over contamination-related injuries. Case settled on a mass basis for over $10 million.

- *Januszewski v. Horseshoe Hammond,* No. 2:00CV352JM (N.D. Ind.): Part of team of attorneys in mass suit alleging that defendant riverboat casino caused injuries to its employees arising from exposure to second-hand smoke.

The firm's cases regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## GENERAL COMMERCIAL LITIGATION

Our attorneys have handled a wide range of general commercial litigation matters, from partnership and business-to-business disputes to litigation involving corporate takeovers. We have handled cases involving tens of thousands of dollars to "bet the company" cases involving

up to hundreds of millions of dollars. Our attorneys have collectively tried hundreds of cases, as well as scores of arbitrations and mediations.

## OUR ATTORNEYS

**JAY EDELSON** is the founder and Managing Partner OF EDELSON PC. He has been recognized as one of the nation's leading class action lawyers, especially in the areas of privacy, technology, and consumer advocacy. His notable cases include ones involving the national banks' suspensions of home equity lines of credit in the aftermath of the housing collapse, which resulted in the restoration of billions of dollars of consumer credit lines. He has developed much of the positive law under the Telephone Consumer Protection Act, especially in the area of text message spam, resulting in settlements collectively worth over a hundred millions of dollars and earning him the moniker, "the Spam Slammer." Jay has been recognized as a "pioneer" in the emerging field of electronic privacy, having established key precedent in cases throughout the country and reaching some of the most important settlements in this space. Based primarily on his success in bringing consumer technology class actions, the national press has dubbed Jay and his firm the "most feared" litigators in Silicon Valley and, according to the New York Times, tech's "babyfaced … boogeyman." The international press has called Jay one of the world's "profiliertesten (most prominent)" privacy class action attorneys.

In addition to complex defense-side litigation, which he handles only in select cases, Jay also offers strategic support to start-ups, including several that have become national brands.

Jay is a frequent speaker and writer on class action issues, the practice of law more generally, and training and law firm management — the latter earning him recognition by the ABA as one of "the most creative minds in the legal industry". He is an adjunct professor at Chicago-Kent School of Law, where he has taught seminars on class actions and negotiation. He has written a blog for Thomson Reuters, called Pardon the Disruption, where he focused on ideas necessary to reform and reinvent the legal industry.

**RYAN D. ANDREWS** is a Partner at EDELSON PC. He presently leads the firm's complex case resolution and appellate practice group, which oversees the firm's class settlements, class notice programs, and briefing on issues of first impression.

Ryan has been appointed class counsel in numerous federal and state class actions nationwide that have resulted in over $100 million dollars in refunds to consumers, including: *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.): *Ellison v Steve Madden, Ltd.*, No. cv 11-5935 PSG (C.D. Cal.); *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D. Cal.); *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill.): *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cir. Ct. Cook Cnty., Ill.); and *Lofton v. Bank of America Corp.*, No. 07-5892 (N.D. Cal.).

Representative reported decisions include: *Lozano v. Twentieth Century Fox*, 702 F. Supp. 2d 999 (N.D. Ill. 2010), *Satterfield v. Simon & Schuster, Inc.* 569 F.3d 946 (9th Cir. 2009), *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); *In re Jiffy Lube Int'l Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D.

Cal. 2013); and *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292 (D. Nev. Mar. 26, 2014).

Ryan graduated from the University of Michigan, earning his B.A., with distinction, in Political Science and Communications. Ryan received his J.D. with High Honors from the Chicago-Kent College of Law and was named Order of the Coif. Ryan has served as an Adjunct Professor of Law at Chicago-Kent, teaching a third-year seminar on class actions. While in law school, Ryan was a Notes & Comments Editor for The Chicago-Kent Law Review, earned CALI awards for the highest grade in five classes, and was a teaching assistant for both Property Law and Legal Writing courses. Ryan externed for the Honorable Joan B. Gottschall in the United State District Court for the Northern District of Illinois.

Ryan is licensed to practice in Illinois state courts, the United States District Court for the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit, and the U.S. Court of Appeals for the Ninth Circuit.

**RAFEY S. BALABANIAN** is a Partner and General Counsel at EDELSON PC. Rafey's practice focuses upon a wide range of complex consumer class action litigation, as well as general business litigation. In the class action context, Rafey has extensive experience both prosecuting and defending class actions.

On the plaintiff's side, Rafey has been appointed lead counsel in numerous class actions, and has achieved landmark settlements involving the telecom industry worth hundreds of millions of dollars, including nationwide settlements in the cases *Pimental, et al. v. Google, Inc.*, No. 11-cv-2585 (N.D. Cal.); *Van Dyke v. Media Breakaway, LLC*, No. 08-cv-22131 (S.D. Fla.); *Williams v. Motricity, Inc., et al.*, No. 09 CH 19089 (Cir. Ct. Cook Cnty., Ill.); and *Walker v. OpenMarket, Inc., et al.*, No. 08 CH 40592 (Cir. Ct. Cook Cnty., Ill.).

Rafey's plaintiff's class action practice also focuses on consumer privacy issues and some of his most notable accomplishments include nationwide settlements reached with companies such as Netflix (*In re Netflix Privacy Litig.*, No. 11-cv-379 (N.D. Cal.)) and RockYou (*Claridge v. RockYou, Inc.*, No. 09-cv-6030 (N.D. Cal.)). Rafey also led the effort to secure adversarial class certification of what is believed to be the largest privacy class action in the history of U.S. jurisprudence in the case of *Dunstan, et al. v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.).

On the business side, Rafey has counseled clients ranging from "emerging technology" companies, real estate developers, hotels, insurance companies, lenders, shareholders and attorneys. He has successfully litigated numerous multi-million dollar cases, including several "bet the company" cases. And, with respect to the defense of class action, Rafey's practice focuses mainly on the defense of corporate clients facing wage and hour lawsuits brought under the Fair Labor Standards Act.

Rafey received his J.D. from the DePaul University College of Law in 2005. While in law school, he received a certificate in international and comparative law. A native of Colorado,

Rafey received his B.A. in History, with distinction, from the University of Colorado – Boulder in 2002.

**CHRISTOPHER L. DORE** is a Partner at EDELSON PC where he focuses his practice on emerging consumer technology issues, with his cases relating to online fraud, deceptive marketing, consumer privacy, negative option membership enrollment, and unsolicited text messaging. Chris is also a member of the firm's Incubation and Startup Development Group wherein he consults with emergent businesses.

Chris has been appointed class counsel in multiple class actions, including one of the largest text-spam settlements under the Telephone Consumer Protection Act, groundbreaking issues in the mobile phone industry and fraudulent marketing, as well as consumer privacy. *See Kramer v. Autobytel, Inc.*, No. 10-cv-02722-CW (N.D. Cal.); *Turner v. Storm8, LLC*, No. 09-cv-05234 (N.D. Cal.); *Standiford v Palm, Inc.*, No. 09-cv-05719-LHK (N.D. Cal.); and *Espinal v. Burger King Corp.*, No. 09-cv-20982 (S.D. Fla.). In addition, Chris has achieved groundbreaking court decisions protecting consumer rights. Representative reported decisions include: *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855 (N.D. Cal. 2011); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); and *Van Tassell v. United Marketing Group, LLC*, 795 F. Supp. 2d 770 (N.D. Ill. 2011). In total, his suits have resulted in hundreds of millions of dollars to consumers.

Outside of consumer class actions, Chris actively advises technology related startups, including providing compliance and marketing guidance, as well as hands-on concept and business development.

Prior to joining EDELSON PC, Chris worked for two large defense firms in the areas of employment and products liability. Chris graduated *magna cum laude* from The John Marshall Law School, where he served as the Executive Lead Articles for the Law Review, as well as a team member for the D.M. Harish International Moot Court Competition in Mumbai, India. Chris has since returned to his alma mater to lecture on current issues in class action litigation and negations.

Before entering law school, Chris received his Masters degree in Legal Sociology, graduating *magna cum laude* from the International Institute for the Sociology of Law, located in Onati, Spain. Chris received his B.A. in Legal Sociology from the University of California, Santa Barbara.

**ALEXANDER T.H. NGUYEN** is a Partner at EDELSON PC and leads the firm's Complex Trials Team.

Before joining the firm, Alex served as federal prosecutor and deputy chief of the cybercrime unit for the United States Attorney's Office in the Eastern District of Virginia in Alexandria, Virginia. In that capacity, he investigated, prosecuted, supervised, and tried a wide range of computer crime and intellectual property matters, including hacking and cyber intrusions, data breaches, intellectual property violations, large-scale identity theft and online fraud, national security, trade secrets, and online child exploitation matters. Before that, he also served as a federal prosecutor for the United States Attorney's Office in the Eastern District of Pennsylvania

in Philadelphia, Pennsylvania, where he prosecuted criminal matters, including tax evasion, political corruption, fraud, money laundering, terrorism, narcotics, and violent crime.

In 2010 and 2011, he served in the Office of the White House Counsel to help manage and implement key White House law and public policy initiatives, helped respond to congressional oversight investigations, provided ethics advice to senior officials, and assisted with political appointments.

Alex graduated *magna cum laude* from Harvard University and received his J.D. from Yale Law School. He has previously served on the board of the Asian Pacific American Bar Association Educational Fund and was the president of the Vietnamese American Bar Association in Washington, D.C.

**BENJAMIN H. RICHMAN** is a Partner at EDELSON PC. He handles plaintiffs'-side consumer class actions, focusing mainly on technology-related cases, represents corporate defendants in class actions, and handles general commercial litigation matters.

On the plaintiff's side, Ben has brought industry-changing lawsuits involving the marketing practices of the mobile industry, print and online direct advertisers, and Internet companies. He has successfully prosecuted cases involving privacy claims and the negligent storage of consumer data. His suits have also uncovered complex fraudulent methodologies of Web 2.0 companies, including the use of automated bots to distort the value of consumer goods and services. In total, his suits have resulted in hundreds of millions of dollars to consumers.

On the defense side, Ben has represented large institutional lenders in the defense of employment class actions. He also routinely represents technology companies in a wide variety of both class action defense and general commercial litigation matters.

Ben received his J.D. from The John Marshall Law School, where he was an Executive Editor of the Law Review and earned a Certificate in Trial Advocacy. While in law school, Ben served as a judicial extern to the Honorable John W. Darrah of the United States District Court for the Northern District of Illinois, in addition to acting as a teaching assistant for Prof. Rogelio Lasso in several torts courses. Ben has since returned to the classroom as a guest-lecturer on issues related to class actions, complex litigation and negotiation. He also lectures incoming law students on the core first year curriculums. Before entering law school, Ben graduated from Colorado State University with a B.S. in Psychology.

Ben is also the director of EDELSON PC's Summer Associate Program.

**ARI J. SCHARG** is a Partner at EDELSON PC and leads the firm's Data Security Litigation Group. He handles technology-related class actions, focusing mainly on cases involving privacy and data security issues, including the illegal collection, storage, and disclosure of personal information and text message spam. Ari has been appointed class counsel by state and federal courts in several nationwide class actions, including *Fox v. Time, Inc.*, No. 12-cv-14390 (E.D. Mich. July 27, 2015); *Halaburda v. Bauer Publishing Co.*, No. 12-cv-12831 (E.D. Mich.); *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.); *In re: LinkedIn User Privacy Litigation*, No.

5:12-cv-03088 (N.D. Cal.); *Coffman v. Glide Talk. Ltd.*, No. 14 CH 08513 (Cir. Ct. Cook Cnty, Ill.); *Webb v. Cleverbridge, et al.*, No. 11-cv-4141 (N.D. Ill.); *Ledet v. Ascentive*, No. 11-cv-294 (E.D. Penn.); and *Grant v. Commonwealth Edison Company*, No. 13-cv-8310 (N.D. Ill.), and was appointed sole-lead class counsel in *Loewy v. Live Nation*, No. 11-cv-4872 (N.D. Ill.), where the court praised his work as "impressive" and noted that he "understand[s] what it means to be on a team that's working toward justice." Ari was selected as an Illinois Rising Star (2013, 2014, 2015) by Super Lawyers.

Prior to joining the firm, Ari worked as a litigation associate at a large Chicago firm, where he represented a wide range of clients including Fortune 500 companies and local municipalities. His work included representing the Cook County Sheriff's Office in several civil rights cases and he was part of the litigation team that forced Craigslist to remove its "Adult Services" section from its website.

Ari received his B.A. in Sociology from the University of Michigan – Ann Arbor and graduated magna cum laude from The John Marshall Law School where he served as a Staff Editor for THE JOHN MARSHALL LAW REVIEW and competed nationally in trial competitions. During law school, he also served as a judicial extern to The Honorable Bruce W. Black of the U.S. Bankruptcy Court for the Northern District of Illinois.

**COURTNEY BOOTH** is an Associate at EDELSON PC where her practice focuses on consumer and tech-related class actions.

Courtney received her J.D., *magna cum laude*, from The John Marshall Law School. While in law school, she was a staff editor of The John Marshall Law Review, a teaching assistant for Legal Writing and Civil Procedure, and a member of the Moot Court Honor Society. Courtney represented John Marshall at the Mercer Legal Ethics and Professionalism Competition where she was a semi-finalist and won Best Respondent's Brief and at the Cardozo/BMI Entertainment and Communications Law Competition where she placed in the top three oralists. Courtney was a 2013 Member of the National Order of Scribes.

Courtney focuses her public service efforts on providing settlement-related assistance to *pro se* plaintiffs. In one of her recent *pro bono* cases, the Court recognized Courtney's efforts and "express[ed] its appreciation" to her, stating that "[t]he work she has done for the plaintiff is of the highest order and the way she has conducted herself in court is to be commended." *See Sroga v. City of Chicago*, No. 12-cv-9288, Dkt. 65 (N.D. Ill. Aug. 6, 2014).

Prior to law school, Courtney attended Saint Louis University where she earned a B.A. in Communication. While there, she was a community relations intern for the St. Louis Blues.

**JONATHAN W. HODGE** is an Associate at EDELSON PC where his practice focuses on complex consumer class actions.

Prior to joining EDELSON PC, Jonathan handled complex commercial litigation at an Am Law 100 defense firm, where he drove successful outcomes in matters with as much as $100,000,000 in controversy. Previously, Jonathan served as a consultant for a tech incubator where he helped

clients form new business based on patent-protected technologies developed at the University of Michigan. He also served in the accounting department of Nucor Steel-Hertford, where his IT skillsets helped him largely automate the monitoring of the largest cost at a multibillion-dollar division of America's largest steel company.

Jonathan received his J.D. from the University of Michigan Law School. While in law school, Jonathan participated in the Campbell Moot Court and the Frank Murphy Society 1L Oral Advocacy Competition. He was awarded Legal Practice Honors for performing in the top 20% of his first-year legal research and writing classes.

Jonathan graduated *summa cum laude* from Chowan University, earning his B.S. in Business Administration with a double concentration in Information Systems and Accounting.

**JAMIE J. R. HOLZ** is an Associate at EDELSON PC where his practice focuses on tech and privacy-related class actions.

Jamie received his J.D., *magna cum laude*, from The John Marshall Law School. While attending law school, Jamie participated in The John Marshall Law Review and the Moot Court Honors Council, and was a Board Member for The John Marshall Trial Advocacy and Dispute Resolution Honors Board. Jamie competed nationally on several alternative dispute resolution teams, was the Herzog Moot Court Competition champion and a two-time Triple Crown Alternative Dispute Resolution Competition champion.

Jamie was an extern to the Honorable Arlander Keys in the United States District Court for the Northern District of Illinois and with the Cook County State's Attorney's Office. Jamie completed his time at John Marshall as a David R. Sargis Scholar and walked away with CALI awards in property law and civil procedure.

Prior to law school, Jamie attended Loras College where he earned a B.A. in Creative Writing and English Literature.

**ALICIA HWANG** is an Associate at EDELSON PC. Alicia practices in the area of consumer class action and general litigation.

Alicia received her J.D. from the Northwestern University School of Law, where she was an articles editor for the Journal of Law and Social Policy. During law school, Alicia was a legal intern for the Chinese American Service League, served as president of the Asian Pacific American Law Student Association and the Student Animal Legal Defense Fund, and was Chair of the Student Services Committee. She also worked as a student in the Northwestern Entrepreneurship Law Clinic and Complex Civil Litigation and Investor Protection Clinic.

Prior to joining EDELSON PC, Alicia worked as an Executive Team Leader for the Target Corporation, as well as a public relations intern for a tourism-marketing agency in London.

Alicia graduated *magna cum laude* from the University of Southern California, earning her B.A. in Communication. She is a member of the Phi Beta Kappa honor society.

**NICK LARRY** is an Associate at EDELSON PC where his practice focuses on technology and privacy class actions.

Nick has been appointed class counsel in multiple class actions that have resulted in tens of millions of dollars in refunds to consumers, including: *In re LinkedIn User Privacy Litig.*, No. 12-cv-3088 (N.D. Cal.); *Halaburda v. Bauer Publishing Co., LP*, No. 12-cv-12831 (E.D. Mich.); *Dunstan v. comScore*, No. 11-cv-5807 (N.D. Ill.); and *In re Netflix Privacy Litig.*, No. 11-cv-379 (N.D. Cal.).

Nick received his J.D., *cum laude*, from Northwestern University School of Law, where he was a senior editor of the Northwestern University Journal of International Law and Business. His student Comment, which examines the legal issues that may arise from National Hockey League players' participation in the 2014 Olympic Winter Games, appears in Vol. 32, No. 3A of the Northwestern University Journal of International Law and Business.

Nick attended Michigan State University, where he graduated with a B.A. in General Business Administration/Pre-law and played on the school's rugby team.

**J. AARON LAWSON** is an Associate at EDELSON PC where his practice focuses on appeals and complex motion practice.

Before coming to Edelson, Aaron served for two years as a Staff Attorney for the United States Court of Appeals for the Seventh Circuit, handling appeals involving a wide variety of subject matter, including consumer-protection law, employment law, criminal law, and federal habeas corpus. While at the University of Michigan Law School, Aaron served as the Managing Editor for the Michigan Journal of Race & Law, and participated in the Federal Appellate Clinic. In the clinic, Aaron briefed a direct criminal appeal to the United States Court of Appeals for the Sixth Circuit, and successfully convinced the court to vacate his client's sentence.

**DAVID I. MINDELL** is an Associate at EDELSON PC where he helps direct a team of attorneys and engineers in investigating and litigating cases involving complex tech fraud and privacy violations. His team's research has led to lawsuits involving the fraudulent development, marketing, and sale of computer software, unlawful tracking of consumers through mobile-devices and computers, unlawful collection, storage, and dissemination of consumer data, mobile-device privacy violations, large-scale data breaches, and the Bitcoin industry. On the other side, David also serves as a consultant to a variety of emerging technology companies.

Prior to joining EDELSON PC, David co-founded several tech, real estate, and hospitality related ventures, including a tech startup that was acquired by a well-known international corporation within its first three years. David has advised tech companies on a variety of legal and strategic business-related issues, including how to handle and protect consumer data. He has also consulted with startups on the formation of business plans, product development, and launch.

While in law school, David was a research assistant for University of Chicago Law School Kauffman and Bigelow Fellow, Matthew Tokson, and for the preeminent cyber-security professor, Hank Perritt at the Chicago-Kent College of Law. David's research included

cyberattack and denial of service vulnerabilities of the Internet, intellectual property rights, and privacy issues.

David has spoken to a wide range of audiences about his investigations and practice.

**AMIR MISSAGHI** is an Associate at EDELSON PC where he focuses on technology and privacy class actions.

Amir received his J.D. from the Chicago-Kent College of Law, where he was a member of the Moot Court Honor Society and a teaching assistant in Property. Before law school, he attended the University of Minnesota, where he received his B.S. and M.S. in Applied Economics. He then began working at a Fortune 50 company as a programmer and data analyst. During that time Amir started working on his graduate studies in Applied Economics where he focused on analyzing consumer choice in healthcare markets.

**ROGER PERLSTADT** is an Associate at EDELSON PC, where he concentrates on appellate and complex litigation advocacy. He has briefed and argued appeals and motions in both federal and state appellate courts.

Prior to joining the firm, Roger was a law clerk to United States District Court Judge Elaine E. Bucklo, an associate at a litigation boutique in Chicago, and a Visiting Assistant Professor at the University of Florida Levin College of Law. He has published articles on the Federal Arbitration Act in various law reviews.

Roger has been named a Rising Star by *Illinois Super Lawyer Magazine* four times since 2010.

Roger graduated from the University of Chicago Law School, where he was a member of the University of Chicago Law Review. After law school, he served as a clerk to the Honorable Elaine E. Bucklo of the United States District Court for the Northern District of Illinois.

**EVE-LYNN J. RAPP** is an Associate at EDELSON PC, focusing her practice in the areas of class action and general litigation.

Prior to joining the firm, Eve-Lynn was involved in numerous class action cases in the areas of consumer and securities fraud, debt collection abuses, and public interest litigation. Eve-Lynn has substantial experience in both state and federal courts, including successfully briefing issues in both the United States and Illinois Supreme Courts.

Eve-Lynn received her J.D. from Loyola University of Chicago-School of Law, graduating *cum laude*, with a Certificate in Trial Advocacy. During law school, Eve-Lynn was an Associate Editor of Loyola's International Law Review and externed as a "711" at both the Cook County State's Attorney's Office and for Cook County Commissioner Larry Suffredin. Eve-Lynn also clerked for both civil and criminal judges (Honorable Yvonne Lewis and Plummer Lott) in the Supreme Court of New York.

Eve-Lynn graduated from the University of Colorado, Boulder, with distinction and Phi Beta Kappa honors, receiving a B.A. in Political Science.

**BEN THOMASSEN** is an Associate at EDELSON PC. At the firm, Ben's practice centers on the prosecution of class actions cases that address federally protected privacy rights and issues of consumer fraud—several of which have established industry-changing precedent. Among other high profile cases, Ben recently played key roles in delivering the winning oral argument before the United States Court of Appeals for the Eleventh Circuit in *Curry v. AvMed*, 693 F.3d 1317 (11th Cir. 2012) (a data breach case that has, following the Eleventh Circuit's decision, garnered national attention both within and without the legal profession) and securing certification of a massive consumer class in *Dunstan v. comScore*, No. 11 C 5807, 2013 WL 1339262 (N.D. Ill. Apr. 2, 2013) (estimated by several sources as the largest privacy case ever certified on an adversarial basis).

Ben received his J.D., *magna cum laude*, from the Chicago-Kent College of Law, where he also earned his certificate in Litigation and Alternative Dispute Resolution and was named Order of the Coif. At Chicago-Kent, Ben was Vice President of the Moot Court Honor Society and earned (a currently unbroken firm record of) seven CALI awards for receiving the highest grade in Appellate Advocacy, Business Organizations, Conflict of Laws, Family Law, Personal Income Tax, Property, and Torts.

Before settling into his legal career, Ben worked in and around the Chicago and Washington, D.C. areas in a number of capacities, including stints as a website designer/developer, a regular contributor to a monthly Capitol Hill newspaper, and a film projectionist and media technician (with many years experience) for commercial theatres, museums, and educational institutions. Ben received his Bachelor of Arts, *summa cum laude*, from St. Mary's College of Maryland and his Master of Arts from the University of Chicago.

**SAMUEL LASSER** is Of Counsel to EDELSON PC.

Samuel graduated with a degree in history from the University of Michigan (Ann Arbor) and received his J.D. from the University of San Francisco.

**SHAWN DAVIS** is the Director of Digital Forensics at Edelson PC, where he leads a technical team in investigating claims involving privacy violations and tech-related abuse. His team's investigations have included claims arising out of the fraudulent development, marketing, and sale of computer software, unlawful tracking of consumers through digital devices, unlawful collection, storage, and dissemination of consumer data, large-scale data breaches, receipt of unsolicited communications, and other deceptive marketing practices.

Prior to joining Edelson PC, Shawn worked for Motorola Solutions in the Security and Federal Operations Centers as an Information Protection Specialist. Shawn's responsibilities included network and computer forensic analysis, malware analysis, threat mitigation, and incident handling for various commercial and government entities.

Shawn has been a member of the adjunct faculty of the School of Applied Technology at the

Illinois Institute of Technology (IIT) since December of 2013. Additionally, Shawn is a faculty member of the IIT Center for Cyber Security and Forensics Education which is a collaborative space between business, government, academia, and security professionals. Shawn's contributions aided in IIT's designation as a National Center of Academic Excellence in Information Assurance by the National Security Agency.

Shawn graduated with high honors from the Illinois Institute of Technology with a Masters of Information Technology Management with a specialization in Computer and Network Security. During graduate school, Shawn was inducted into Gamma Nu Eta, the National Information Technology Honor Society.