## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CHERYL JOHNSON-MORRIS, individually and on behalf of all others similarly situated, *Plaintiff*, v. SANTANDER CONSUMER USA INC., an Illinois corporation, *Defendant*. | Case No. 1:16-cv-01456 *Related to*: Case No. 1:12-cv-04671 Case No. 1:12-cv-09431 Honorable Charles P. Kocoras Honorable Sidney I. Schenkier |

## **FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Cheryl Johnson-Morris ("Plaintiff") brings this First Amended Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Santander Consumer USA Inc. ("Santander") to stop its practice of charging unlawful debt collection fees and to obtain redress for all persons injured by its conduct, as well as individually to seek redress for Santander's unlawful and harassing telephone calling practices. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

### NATURE OF THE ACTION

1. Defendant Santander is an industry leader in "nonprime" auto loans.[1] Approximately 79% of its auto loan portfolio consists of "nonprime receivables" from

---

[1] Santander Consumer USA Holdings Inc., *Annual Report (Form 10-K)*, at 6 (March 2, 2015), *available at* https://www.sec.gov/Archives/edgar/data/1580608/000158060815000031/santander201410-k.htm (last accessed Feb. 25, 2016).

consumers "who do not qualify for conventional consumer finance products as a result of, among other things, a lack of or adverse credit history, low income levels and/or the inability to provide adequate down payments." *Id*. at 18.

2. Not surprisingly, Santander's business model of targeting high-risk, nonprime loans causes its overall loan delinquency rate to be substantially higher than industry averages, and a large percentage of Santander consumers have difficulty making their loan payments precisely when due. Indeed, due in part to its focus on nonprime loans, it "repossessed 227,041 vehicles, incurring $1.7 billion in net losses, during the twelve months ended December 31, 2014." *Id*. Santander's target consumers are often in unstable circumstances where they are relatively more susceptible to harassment, oppression, and abuse.

3. Unfortunately, Santander capitalizes on these circumstances by incessantly calling consumers and steering them into using unnecessary, high-fee services to make routine loan payments on fear of otherwise potentially losing what is often their primary means of transportation.

4. For instance, Santander often pushes consumers to pay through a Western Union service—which imposes large processing fees that are surreptitiously shared with Santander—even though other free methods of timely payment are in fact available. These fees are not pass-through costs reflective of actual third-party processing charges but rather are arbitrary amounts imposed at Santander's direction to drive excess profits for itself.

5. Santander also uses advanced autodialing equipment and prerecorded messages to repeatedly machine-dial cellular telephone numbers, like Plaintiff's, without prior express consent.

6. Through this standardized course of conduct, Santander routinely and willfully violates the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 (the "FDCPA"), which prohibits debt collectors like Santander from collecting "*any* amount" incidental to a consumer debt unless "such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1) (emphasis added). Santander also violates the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"), which strictly forbids the repetitive autodialing and robocalling of private cellular telephone numbers, without consent.

7. In response to Defendant's unlawful conduct, Plaintiff files the instant lawsuit seeking an injunction requiring Defendant to cease imposing unlawful fees on consumers, as well as an award of actual and statutory damages to the members of the Classes as provided under the FDCPA, together with costs and reasonable attorneys' fees. She further seeks to recover statutory damages under the TCPA on an individual basis only, trebled due to the knowledge and willfulness of Defendant's conduct, together with costs and reasonable attorneys' fees.

**PARTIES**

8. Plaintiff Cheryl Johnson-Morris is a natural person and citizen of the State of Illinois and resident of Cook County.

9. Defendant Santander is a limited liability company organized and existing under the laws of the State of Illinois with its principal place of business located at 1601 Elm Street, Suite 800, Dallas, Texas 75201.

10. Defendant Santander is registered to do business with the Illinois Secretary of State and does business in Illinois and throughout the United States.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the FDCPA and the TCPA, which are federal statutes.

12. This Court has personal jurisdiction over Defendant because it is incorporated pursuant to the laws of the State of Illinois, maintains executive offices and other real property within this District, is registered to do business within this district, and routinely transacts business within this District, including placing collection calls to and accepting payments from residents of this District. Additionally, the wrongful conduct complained of herein caused Plaintiff, a resident of the State of Illinois, to suffer injuries within this District.

13. Venue is proper because Defendant maintains executive offices and other real property within this District, is registered to do business within this district, and routinely transacts business within this District, including placing collection calls to and accepting payments from residents of this District. Additionally, Plaintiff, an individual, resides in this District, and the wrongful conduct complained of herein was directed to her within this District.

## COMMON FACTUAL ALLEGATIONS

14. Santander services over $24 billion in consumer loans, more than 75% of which are nonprime.[2] Among other things, it creates and sends monthly statements to consumers, collects loan payments, and processes loan payments. In addition to servicing its own loans, it regularly services loans originated by other companies. As such, it regularly collects or attempts to collect debts owed to others and is a "debt collector" as that term is defined in the FDCPA. Many of the debts Santander services were in default at the time Santander acquired them.

---

[2] *Id*. at 50.

15. Many of Santander's "customers" are involuntary consumers who are only forced to work with Santander because it acquired the rights to collect on their loans without their prior knowledge or consent or because their car dealerships independently elected to use Santander to provide subprime financing. These consumers, whose voluntary relationships with car dealerships have locked them into financing relationships with Santander, often find that in order to keep their vehicles they must deal with Santander for as long as it services their loans, regardless of how they are treated by it or its employees.

16. Due to these captive economics, Santander has little incentive to treat borrowers well. Indeed, Santander often subjects consumers, who may already feel overwhelmed by their struggles to make timely payments and who may believe their means of transportation are at risk, to the private importuning of trained and aggressively-incentivized collection agents applying high-pressure collection techniques in direct, intense, real-time encounters. When these collection agents order consumers to pay immediately or face adverse consequences (such as potentially losing their vehicles), such consumers may find it difficult fully to evaluate all available alternatives with reasoned judgment and may readily succumb to the agent's insistence upon immediate payment, despite the imposition of excessive processing fees.

17. Accordingly, Santander has routinely represented that payment methods with convenience fees, processing fees, or other such fees were the only payment methods available for consumers to use to make timely payments on their personal debts, even when other no-cost or lower-cost payment methods were actually available. These fees exceed any charges actually imposed by third-party payment processors, if any, for the cost of processing payments, and as such are not pass-through costs but rather serve as arbitrary profit drivers. By imposing these

arbitrary fees, Santander has effectively and artificially enlarged the debts owed by thousands of consumers, enriching itself at the expense of those least able to afford it.

18. Consumers complain about Santander's fee-steering, but due to its other practices—such as imposing stiff late fees while taking up to two full business weeks to post payments—consumers feel compelled to pay Santander's arbitrary fees anyways. Not surprisingly, consumer complaints against fee-steering, and against Santander generally, are legion:[3]



**Figure 1** (Santander consumer ratings.)

---

[3] Screenshots from Consumer Affairs, available at http://www.consumeraffairs.com/finance/santander.html; and Ripoff Report, available at http://santander-consumer.pissedconsumer.com/santander-consumer-usa-is-a-ripoff-20100920199159.html (last accessed Feb. 25, 2016).

> I received notice one week ago that Santander is now handling my auto payments that were with Citifinancial. After visiting their site and trying to log on with my username and password from CItifinancial's site as they said it would work I had to call their customer service twice, because the first time I was hung up on after an associate put me on hold for 5 minutes. The second time they said I had to go back to their website, follow a bunch of steps, then submit my request to have my password reset.
>
> After I received the email to reset my password, I then logged on hoping to pay for my account online via their site and not have to pay $10.95 as they charge to do so over the phone as I used to do with Citifinancial for free. NO LUCK! They charge $10.95 whether you pay online with checking account/ATM/credit or over the phone. You can mail your payment but it takes 7-10 days to post which means you'll be charged interest and late fees. They know it's a setup, which is why they try and sell you on the fact that paying the $10.95 will 'save you' from paying more in fees late if your payment isn't credited on time.
>
> I'd have no problem mailing my payment 14 days in advance if I hadn't read online from various sources that people who send in payments via check have the amounts altered and initialed by an employee or someone rips off their account info and suddenly random charges start appearing on their accounts.
>
> I'm SO MAD I have to pay $10.95 tonight to 'ensure' my payment won't be late to avoid fees, even though it's 10:15pm on 09/19 and my payment isn't due until 9/27. Well, I know in 2 weeks I will be getting a money order and mailing it because I will not pay $10.95 to PAY a bill nor risk giving these jokers my account # cause they hire unscrupulous employees.

**Figure 2** (Consumer complaining of Santander's fee-steering "setup.")



**Figure 3** (Consumer complaining of Santander's ineffective auto-pay settings and fees.)

19.     Consumers are not alone in their complaints. At least one Santander employee has complained about preying on lower-income people in order to hold them hostage and charge extra fees:



**Figure 4** (Employee complaining about holding lower-income consumers hostage to charge extra fees.)[4]

20. Indeed, on a daily basis and for years, Santander has knowingly embarked on a systematic campaign of imposing unlawful and excessive convenience fees during routine consumer payment transactions, all to artificially and unilaterally enlarge the consumer debts owed to it. These convenience fees far exceed any actual third-party processing costs that Santander actually incurs, are not expressly authorized by the original agreements creating the consumer debts, and are not specifically permitted by Illinois law.

21. Additionally, Santander does not advertise its fee-sharing. It does not publically disclose that its convenience fees do not reflect third-party processing costs, nor does it disclose that it splits such fees (*i.e.*, shares profits) with third-parties. It certainly does not tell consumers where their money goes at the time they pay.

22. Like most of the details of its financial practices, Santander's fee-sharing is not common public knowledge, and neither Plaintiff nor the members of the Classes knew or can

---

[4] Indeed.com, available at http://www.indeed.com/cmp/Santander-Consumer-USA-Inc/reviews?fcountry=US&start=160 (last accessed Feb. 25, 2016.)

8

reasonably be expected to have known that Santander's convenience fees did not actually reflect third-party processing costs.

## FACTS RELATING TO PLAINTIFF JOHNSON-MORRIS

23. On January 10, 2005, Plaintiff Johnson-Morris purchased a 2003 Ford Escape at Jacobs Twin Honda in Chicago, Illinois. She purchased this vehicle primarily for personal and household use and she financed her purchase through a consumer loan (*see* Retail Installment Contract, attached hereto as <u>Exhibit 1</u>). This loan did not authorize convenience fees. *See id*.

24. Plaintiff's loan was originated by HSBC Finance Corporation f/k/a Household Automotive Finance Corporation ("HSBC"). *See id.* Accordingly, when Plaintiff became a consumer obligated to pay a consumer debt that arose out of a transaction to purchase a personal vehicle, Santander was not the original creditor.

25. However, on or about November 10, 2009, Santander reached an agreement with HSBC's auto finance entities to enter into a loan servicing agreement for its entire U.S. auto loan portfolio, which was in liquidation.[5] At the time this agreement was announced, the "transaction [was] expected to close in the first quarter of 2010." *Id*.

26. On or about March 15, 2010, the aforementioned loan servicing agreement between Santander and HSBC closed and took effect, and Santander acquired the servicing rights to collect on Plaintiff's auto loan.

27. At the time when Santander acquired the servicing rights to collect on Plaintiff's auto loan, she was unemployed, and she owed late fees in arrears and was otherwise in default.

---

[5] *See* HSBC Finance, Press Release: *HSBC Finance, Santander Consumer in Agreement on HSBC's US Auto Business*, available at http://www.businesswire.com/news/home/ 20091110005196/en/HSBC-Finance-Santander-Consumer-Agreement-HSBCs-Auto (last accessed Feb. 25, 2016).

Santander placed a telephone call to her, informed her that it was calling to collect a debt, and represented that she was behind on her payments. Accordingly, Santander acquired the rights to service Plaintiff's debt at a time when she was actually or allegedly in default, and Santander is a debt collector with regards to Plaintiff and her debt.

28. From the start, Santander placed incessant calls to Plaintiff in efforts to collect on her debt, including prerecorded voice calls to her cellphone.[6] Defendant also placed calls to Plaintiff's cellphone using equipment having the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, *en masse*, by the thousands and without active human intervention (an "automatic telephone dialing system" or "ATDS").

29. Plaintiff did not provide Defendant with her phone number, but instead had her number "trapped" when she called Defendant to make a payment. Accordingly, she never consented to receive Defendant's calls on her cellphone. To the contrary, she informed Defendant that they were calling her on a cellphone and specifically instructed Defendant to stop. Defendant continued calling anyway.

30. Plaintiff estimates that between March 2010 and March 2011, Defendant called her cellphone with prerecorded messages between 20 and 30 different times and further called her cellphone with an ATDS many dozens of times.[7]

---

[6] Plaintiff's redacted cellular telephone number is (***) ***-8925. The full number is available to Defendant Santander through discovery.

[7] A continuing chain of class action lawsuits involving TCPA and FDCPA claims against Santander serve to toll Plaintiff's claims, including *Haynes v. Santander Consumer USA, Inc.*, No. 2:11-cv-2586 (N.D. Ala. July 28, 2011), *Espejo v. Santander Consumer USA, Inc.*, No. 1:11-cv-8987 (N.D. Ill. December 19, 2011), and *Bonner v. Santander Consumer USA, Inc.*, 2:12-cv-2183 (N.D. Ala. June 15, 2012).

31. Plaintiff made debt payments to Santander online and over the phone. When she did so, Santander processed her payments through a service it used in partnership with Western Union. Plaintiff was charged a fee for this service, even though no such fee was authorized by any agreement between Plaintiff and Santander or any specific provision of existing law.

32. Specifically, Santander charged and collected from Plaintiff the convenience fees shown in <u>Figure 5</u>, below:

| Date | Method | Convenience Fee Amount |
|------|--------|------------------------|
| 03/19/10 | Phone | $15.00 |
| 04/16/10 | Internet | $5.00 |
| 05/14/10 | Internet | $5.00 |
| 06/11/10 | Internet | $5.00 |
| 07/20/10 | Internet | $5.00 |
| 08/22/10 | Internet | $5.00 |
| 09/17/10 | Internet | $5.00 |
| 10/14/10 | Internet | $5.00 |
| 11/15/10 | Internet | $5.00 |
| 12/11/10 | Internet | $5.00 |
| 01/29/11 | Internet | $5.00 |
| 02/18/11 | Internet | $5.00 |

**Figure 5** (showing the specific convenience fees Santander charged and collected from Plaintiff.)

33. Western Union kept a portion of the fees paid by Plaintiff and Santander kept the remainder. As such, the convenience fees that Plaintiff paid to make her Santander consumer debt payments exceeded any actual pass-through costs that Santander paid to third parties to process such payments.

34. At no time was this fee sharing disclosed to Plaintiff, and she did not know (nor did she have reason to know) that such fees were shared and were not actual pass-through costs required to process her payments.

35. Plaintiff was harmed by Santander's unlawful fee collections, in that she paid and lost amounts of money above and beyond what he legally owed pursuant to her debt agreements.

## CLASS ALLEGATIONS

36. Plaintiff Cheryl Johnson-Morris brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and the following Classes:

> **FDCPA Class**: All individuals in the United States who: (i) paid a "convenience fee"; (ii) collected in whole or in part by Defendant; (iii) in order to make a payment on a non-commercial vehicle loan; (iv) where the term "convenience fee" was not specifically enumerated in the original agreement creating such debt; and (v) where Defendant's records indicate that the debt had not been current for 30 or more consecutive days at the time Defendant acquired its interested in it.
>
> **Illinois Subclass**: All individuals in the FDCPA Class who reside in the State of Illinois.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

37. **Numerosity:** The exact sizes of the Classes are unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, thousands of consumers fall into the definitions of each of the Classes. Members of the Classes can be easily identified through Defendant's records.

38. **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff's and the Classes' claims, and those questions predominate over any questions that may affect individual members of the Classes. Plaintiff and the members of the

Classes have all been harmed by the same conduct (*i.e.*, Defendant's unlawful collection of convenience fees), and all have claims based on a common application of the same subsections of the same statutes (*i.e.*, 15 U.S.C. § 1692f). Common questions for the Classes include, but are not necessarily limited to the following:

    a. Whether Defendant's conduct violated the FDCPA;

    b. Whether Defendant systematically imposed fees and collected amounts not permitted by law; and

    c. Whether the members of the Classes are entitled to additional statutory damages as a result of the frequency, persistence, and intentionality of Defendant's conduct.

39. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class and Subclasses. Plaintiff and members of the Class and Subclasses sustained damages as a result of Defendant's uniform wrongful conduct during transactions with Plaintiff and the Class and Subclasses.

40. **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's interests are the same as those of the other members of the Classes, in that her claims arise from the same misconduct and share the same essential characteristics as the claims belonging to the other members of the Classes. Plaintiff has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Classes.

41. **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final injunctive relief appropriate with respect to the Classes each as a whole. Defendant's policies challenged herein apply and affect the members of the Classes uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the whole of each the Classes, not on facts or law applicable only to Plaintiff.

42. **Superiority**: This class action is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. The damages suffered by the individual members of the Classes will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendant's misconduct. Even if members of the Classes could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

43. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION
### Violations of the FDCPA, 15 U.S.C. § 1692f
### (On Behalf of Plaintiff and the Classes)

44. Plaintiff incorporates the forgoing allegations as if fully set forth herein.

45. Plaintiff and the members of the Classes are natural persons obligated or allegedly obligated to pay debts arising from transactions that were primarily for personal, family, and/or household purposes, and as such are "consumers" within the meaning of 15 U.S.C. § 1692a(3).

46. Defendant acquired the rights to service or otherwise collect on the consumer debts of Plaintiff and the members of the Classes at times when such debts were in default. Further, Defendant regularly uses instrumentalities of interstate commerce to collect, directly and indirectly, debts owed or due or asserted to be owed or due another. As such, Defendant is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6).

47. Defendant used telephones and other instrumentalities of interstate commerce to employ unfair or unconscionable means to collect or attempt to collect debts. Among other things, Defendant charged and collected "convenience" fees to process certain consumer debt payments made by Plaintiff and the members of the Classes. These fees, although collected incidentally to consumer debts of Plaintiff and the members of the Classes, were not expressly authorized by the original agreements creating such debts and were not specifically permitted by Illinois law. Accordingly, by charging such fees, Defendant explicitly or implicitly misrepresented that it had legal authority to collect such fees. Moreover, for any given payment transaction, the convenience fees charged by Defendant exceeded the incremental pass-through costs, if any, that third-party companies actually imposed on Defendant for the processing of such transaction.

48. By collecting these fees, Defendant violated the FDCPA, 15 U.S.C. § 1692f,

which prohibits debt collectors from using unfair means to collect or attempt to collect debts, and 15 U.S.C. § 1692f(1), which prohibits debt collectors from collecting "any amount" concerning a consumer debt unless such amount is "expressly authorized by the agreement creating the debt or permitted by law."

49. Defendant's fee-collecting misconduct was frequent, persistent, and intentional.

50. As a result of Defendant's unlawful conduct, the consumer debts owed by Plaintiff and the members of the Classes were, in effect, artificially enlarged, and they each paid and lost amounts of money above and beyond what they legally owed pursuant to their debt agreements.

51. Accordingly, pursuant to 15 U.S.C. § 1692k, Plaintiff and the members of the Classes are each entitled to, *inter alia*, actual damages, costs, and attorneys' fees, as well as additional statutory damages of up to $1,000 each.

## SECOND CAUSE OF ACTION
### Autodialer Violations of the TCPA, 47 U.S.C. § 227
### (Individually by Plaintiff)

52. Plaintiff incorporates the forgoing allegations as if fully set forth herein.

53. Defendant and/or its agents made dozens of unsolicited phone calls to a wireless telephone number subscribed to and customarily used by Plaintiff.

54. These calls were made using equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, *en masse*, simultaneously and without human intervention.

55. These calls were made to Plaintiff without her wireless number being provided to Defendant in connection with her debt and without her prior express consent.

56. Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of

16

Defendant's illegal conduct, she suffered damages in the form of any monies paid to receive unsolicited calls on her cellular phone and, under section 227(b)(3)(B), is entitled to, *inter alia*, a minimum of $500.00 in damages for each violation of such Act.

57. Should the Court determine that Defendant's misconduct was willful and knowing, the Court may, pursuant to section 227(b)(3), treble the amount of statutory damages recoverable by Plaintiff.

**THIRD CAUSE OF ACTION**
**Prerecorded Voice Violations of the TCPA, 47 U.S.C. § 227**
**(Individually by Plaintiff)**

58. Plaintiff incorporates the forgoing allegations as if fully set forth herein.

59. Defendant and/or its agents made dozens of unsolicited phone calls to a wireless telephone number subscribed to and customarily used by Plaintiff.

60. These calls featured artificial or prerecorded voices.

61. These calls were made to Plaintiff without her wireless number being provided to Defendant in connection with her debt and without her prior express consent.

62. Defendant has, therefore, violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's illegal conduct, she suffered damages in the form of any monies paid to receive unsolicited calls on her cellular phone and, under section 227(b)(3)(B), is entitled to, *inter alia*, a minimum of $500.00 in damages for each violation of such Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Cheryl Johnson-Morris, individually and on behalf of the Classes, prays for the following relief:

A. An order certifying the Classes defined above, appointing Plaintiff as the representative of the Classes, and appointing her attorneys as counsel for the Classes;

B. An award of actual and statutory damages;

C. An injunction requiring Defendant to cease all unlawful fee-charging conduct, and otherwise protecting the interests of the Classes;

D. An award of reasonable attorneys' fees and costs; and

E. Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

**CHERYL JOHNSON-MORRIS,** individually and on behalf of all similarly situated individuals,

Dated: February 25, 2016        By: s/ J. Dominick Larry
                                   One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
J. Dominick Larry
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

John E. Norris*
jnorris@davisnorris.com
Frank Davis*
fdavis@davisnorris.com
DAVIS & NORRIS, LLP
2154 Highland Avenue South
Birmingham, Alabama 35205
Tel: 205.930.9900
Fax: 205.930.9989

* *Pro hac vice* application to be filed.

*Counsel for Plaintiff and the Classes*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on February 25, 2016, I served the above and foregoing by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

                                        s/ J. Dominick Larry